Felton M. BAKER, Appellant,

v.

Gordon WELCH, Appellee.

No. 01–86–0736–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

July 2, 1987.

Rehearing Denied Aug. 31, 1987.

Buddy W. Gregory, Kenneth G. Johnson, Landis & Gregory, Houston, for appellant.

Robert D. Clements, Jr., Alvin, for appellee.

Before EVANS, C.J., and HOYT and COHEN, JJ.

OPINION

COHEN, Justice.

The trial court rendered judgment against Baker for $20,000 in actual damages and $17,500 in exemplary damages, based on a jury verdict that Baker had tortiously interfered with the business relationship between Welch and Houston Helicopters, Inc. (HHI).

Baker was the founder, sole shareholder, and president of HHI, while Welch operated the Airport Lounge on property that he leased on a month to month basis from HHI. On October 28, 1981, Baker and others went to the Airport Lounge to shoot pool and drink beer. Baker testified that, "the lady that was running the place was very rude, very discourteous and embarrassed me to no end in refusing to serve a beer to my guests and myself."

The next day, Baker notified Welch by letter that HHI was terminating the lease, effective November 29, 1981. Baker testified that he terminated the lease "because if that is the kind of treatment that guests and so forth are to receive, then I didn't want any—their type people on the airport."

Welch testified that when he called to learn the reason for the termination, Baker stated that, "when he was refused service at his own place that he wouldn't stand for it." Welch told Baker that he was refused service because,

whenever in our opinion somebody has too much to drink, we refused to serve them. That's my rules regardless of who they are. For one reason, it breaks the law, liquor law. I could lose my license. Second place, he might get killed going home.

Welch testified that Baker responded,

that he was a very wealthy man. He had traveled all over the world. He drank all over the world and when he

came to his own place with a suit and tie on, he expected to be served.

Baker contends in his first and fifth points of error that he is not liable for tortious interference because he acted as an agent for HHI, his corporate principal, and an agent is not liable for interference with business relations between his principal and third parties. Point of error one contends:

> The trial court erred in permitting the bifurcation of the pysche and personality of Felton Baker when such bifurcation is a mere fiction through which to fashion personal liability on the president of a corporation for tortious interference with the business relationship between the corporation and the third party.

We first note that this is not a claim for tortious interference with a contract. The month-to-month lease contract between the parties was fully performed. It is undisputed that Baker, as HHI's authorized agent, could terminate the lease at will, upon proper notice, and that he gave the required notice.

Welch's claim is for tortious interference with prospective business relations, his theory being that Baker, acting as an individual, tortiously interfered with Baker, as president of HHI, by inducing Baker, as president of HHI, to terminate Welch's lease. Welch argues that Baker, the individual, maliciously used his personal grudge to persuade Baker, the president of HHI, to act, thereby creating liability for tortious interference.

■ Welch had the burden of proving that Baker interfered with another person's business relations. Here, Baker's only act was the termination of the lease, which he did as president of HHI. There is no evidence that he, as an individual, persuaded himself, as HHI's president, to act.

■ A party to a business relation cannot tortiously interfere with himself. Liability must be founded upon the acts of an interfering third party. An agent, such as Baker, generally is not regarded as a third party. Rather, his legal identity is that of his principal. Thus, an agent is generally not personally liable for interfering with his principal's business relations. *Gonzalez v. Gutierrez*, 694 S.W.2d 384, 388 (Tex.App.—San Antonio 1985, no writ); *Terry v. Zachry*, 272 S.W.2d 157, 160 (Tex. Civ.App.—San Antonio 1954, writ ref'd n.r. e.). The agent and the principal are treated as one because the agent is the principal's "alter ego"; their financial interest is the same. *Id.*

It is well settled that interference with contractual relations or future business relations is privileged where it results from the exercise of a party's own rights. *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 91 (Tex.1976) (contract rights); *Davis v. Lewis*, 487 S.W.2d 411, 414 (Tex.Civ.App.—Amarillo 1972, no writ) (prospective business relations). Stock ownership is recognized as a financial interest that will trigger the privilege. *Consolidated Petroleum Indus. v. Jacobs*, 648 S.W.2d 363 (Tex.App.—Eastland 1983, writ ref'd n.r.e.); *Davis v. Alwac Int'l. Inc.*, 369 S.W.2d 797, 802 (Tex.Civ. App.—Beaumont 1963, writ ref'd n.r.e.); *see also Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183, 1196 (5th Cir.1985).

In *Deauville*, the court held, as a matter of law, that neither a parent corporation nor its wholly-owned subsidiary could interfere with the other's business relations because the two corporations were, in legal effect, the same entity. The parent and subsidiary were "aligned so closely" that the court had "difficulty even recognizing their separate identities for the purpose of this analysis." 756 F.2d at 1197. The court thus ignored the fact that the two corporations were separate entities and held that neither could tortiously interfere with the other because their financial interests were identical, since the parent controlled the subsidiary and its profits. 756 F.2d at 1196–97. This analysis was consistent with the holding by our nation's highest court that, "fully owned subsidiaries are incapable of conspiring with their parent, as a matter of law." 756 F.2d at 1192 (citing *Copperweld Corp. v. Independence*

*Tube Co.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)).

We recognize the differences between *Deauville* and *Copperweld,* on the one hand, and the instant case. In *Deauville* and *Copperweld,* a corporation, not an individual, owned all shares of the corporation engaged in the business relationship, and in *Copperweld,* the Supreme Court was considering the scope of a statute, the Sherman Anti-Trust Act, not the scope of a common law tort. We nevertheless are persuaded by the factors that caused the Supreme Court and the Fifth Circuit to disregard the corporate form and look to the nature of the underlying relationship. The Supreme Court wrote:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided *or determined not* by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, ... [I]n reality a parent and a wholly owned subsidiary *always* have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests. 18.
>
> 18. [T]he ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary must be viewed as a single economic unit.

467 U.S. at 771–72, 104 S.Ct. at 2741–42 (emphasis in original).

We hold, as a matter of law, that Baker did not tortiously interfere with Welch's prospective business relations with HHI because Baker and HHI, like the entities in *Deauville* and *Copperweld,* were so closely aligned as to be one entity, guided by one consciousness.

We sustain the first and fifth points of error.

The judgment is reversed, and judgment is rendered that appellee take nothing.