AMERICAN MEDICAL INTERNATIONAL, INC. et al., Appellants,

v.

Benito GIURINTANO, Appellee.

No. A14–89–00379–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 27, 1991.

Roger D. Townsend, Houston, for appellants.

Michael M. Essmyer, Clinard J. Hanby, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and JUNELL and MURPHY, JJ.

## OPINION ON MOTION FOR REHEARING

JUNELL, Justice.

In our opinion of July 3, 1991, a majority of this panel rendered judgment that appellee take nothing. Upon motion for rehearing, we withdraw our original opinion and substitute the following opinion.

This is an appeal from a judgment in favor of appellee Benito Giurintano following a jury verdict favorable to him on his claims of tortious interference with business relationships, fraud, and intentional infliction of emotional distress. Appellee also pled libel, slander, breach of contract, wrongful termination, and breach of the duty of good faith. However, the trial court granted summary judgment as to these latter allegations.[1]

Appellee was an assistant administrator at Huey P. Long Hospital in Pineville, Louisiana. In 1985, appellee began negotiations with American Medical International, Inc. (AMI) through its local vice-president John Sielert (Sielert) for a position as executive administrator at Doctors' Hospital in Laredo, Texas. The hospital had gone through twenty-six (26) administrators in thirteen years. The hospital was having operational problems that in fact resulted in a loss of accreditation. AMI, the owner

---

**1.** Appellee Giurintano brings a cross-appeal as to the summary judgment granted by the trial court. The cross-appeal will be discussed later in this opinion.

of Doctors' Hospital, wished to remedy the situation by hiring a new administrator. AMI pursued Mr. Giurintano aggressively as a candidate for the administrator position. Sielert informed Giurintano of the problems at Doctors' Hospital and also stated that doctors at the facility had pressured past administrators to leave. Giurintano was concerned by the number of directors over a short period of time and the information related to him by Sielert; however, Giurintano was assured by Sielert that he would have the complete backing of the two and a half billion dollar corporation should he become the executive administrator for Doctors' Hospital. This same assurance was repeated to Giurintano at least a dozen times. Terms were discussed and agreed upon without written documentation. Giurintano subsequently traveled to San Antonio, Texas to meet with other AMI executives and the Chief of Staff of Doctors' Hospital, Dr. Roger Keene. Then, Giurintano went to Doctors' Hospital to meet and interview with the Board of Directors and a number of individual doctors. After these meetings, the board of Doctors' Hospital unanimously approved of appellee's placement in the vacant administrator's position.

While still in Louisiana, Giurintano received a telephone call from Pat McCoy who had been recently hired to act as a consultant to the nursing director. Ms. McCoy told Giurintano that Mr. Mata, the assistant administrator, was spreading rumors that when he was hired Giurintano would fire all the department heads. Ms. McCoy also told Giurintano that there were also rumors of a physician boycott and employee unrest. Giurintano called Sielert and reported the information. Sielert told Giurintano not to worry about the rumors, but that Giurintano should get to Laredo as quickly as possible and any problems could be handled from there. Again, Giurintano was assured that he had the backing of a two and a half billion dollar corporation.

In early March of 1985, Giurintano went to Laredo and met with all the department heads and supervisors. Giurintano discussed his management philosophy and responded to questions. Communications by

staff members to Giurintano after the meeting were positive. However, opposition to Giurintano's appointment was present; and the seeds of this opposition were planted by assistant administrator, Homero Mata. Mata and a small group of doctors, defendants in this action, organized themselves against Giurintano. Later, a cocktail party was held in Giurintano's honor. At this party, Giurintano was cornered by certain doctors, Godines, Vasquez, Molina, and L.O. Mendoza, and drawn into argumentative situations, harassed and insulted. The next evening at a dinner party this behavior was continued by Dr. L.F. Mendoza, a cousin of L.O. Mendoza. Giurintano reported this to AMI but was again told not to worry. On March 22, 1985, Giurintano resigned from Huey P. Long Hospital and left for Laredo, Texas and his new job. When he arrived at his hotel in Laredo there was a message for him to call Sielert. When Giurintano called Sielert, he was told not to report to work on March 25 because of opposition at Doctors' Hospital.

On March 25, 1985, appellee found he had no job in Laredo and then discovered he could not regain his job in Louisiana because of a hiring freeze. Appellee was unable to secure employment elsewhere. Appellee brought suit against AMI, Sielert, Doctors' Hospital, and individuals Mata, Godines, Molina, Vasquez, L.O. Mendoza and L.F. Mendoza.

■ After the jury returned its verdict, appellee amended his pleadings to increase the amount of damages sought in the pleadings to that found by the jury; and the court ultimately rendered judgment for more than seven million dollars ($7,000,-000). In this appeal, all the appellants have attacked the post-verdict amendment. This challenge fails, however, because of the Texas Supreme Court's decision in *Greenhalgh v. Service Lloyd's Ins. Co.*, 787 S.W.2d 938 (Tex.1990). In that case the court held that under Tex.R.Civ.P. 63 and 66 a trial court has no discretion to refuse an amendment unless: (1) the opposing party presents evidence of surprise or prejudice, Tex.R.Civ.P. 63 and 66; *Hardin v.*

*Hardin,* 597 S.W.2d 347, 350–351 (Tex. 1980) (Campbell, J., concurring); or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment. *Greenhalgh,* 787 S.W.2d at 939. The burden of showing prejudice or surprise rests on the party resisting the amendment. *Id. citing Patino v. Texas Employers Ins. Ass'n,* 491 S.W.2d 754, 756 (Tex.Civ.App.—Austin 1973, writ ref'd n.r.e.). Because appellee Giurintano's amendment raised no new substantive matters and because appellants failed to show surprise or prejudice, the trial court properly granted the leave to file the amendment. Appellants offered no evidence of how they were surprised by the trial amendment. Appellants merely argued the evidence was insufficient to support the large amount of punitive damages awarded. They wholly failed to show that an increase in punitive damages would have caused them to change their trial posture. Appellants argue that they should be given a remand because the law changed in the area of trial amendments. This is unnecessary because appellants have not shown, even now, that their trial strategy would have been any different. Therefore, appellants AMI and Sielert's seventh point of error is overruled and Doctors' Hospital and the individual appellants' eighth point of error is overruled.

Because this suit involves multiple claims against multiple defendants, it will be necessary to break our opinion down into the separate causes of action and then discuss the appellants' points of error within each cause of action. Appellants AMI and Sielert constitute one group of appellants. The other group of appellants consists of Doctors' Hospital and the individuals named above.

## I. TORTIOUS INTERFERENCE

Appellee alleged, and the jury found, that each named defendant had committed some kind of tortious interference. Appellee first alleged that AMI and Sielert had interfered with his business relations with the hospital. Conversely, appellee alleged that Doctors' Hospital and the named individuals disrupted his business relationship with AMI and Sielert. In his final tortious interference theory, appellee claimed that AMI interfered with his prospective business relations by hampering his search for work after the job in Laredo vanished.

Interference with a business relationship is similar to the tort of contract interference. However, it is unnecessary to prove the existence of a valid contract in proving interference with a business relationship. *CF & I Steel v. Pete Sublett and Co.,* 623 S.W.2d 709, 715 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.).[2] The jury was charged that in order to recover under the theory of tortious interference Giurintano had to prove: (1) unlawful actions undertaken by appellants without a legal right or justifiable excuse; (2) with the intent to harm Giurintano; and (3) resulting actual harm or damage. Appellants contend that as a matter of law no appellant could be found liable for tortious interference because of the close alignment existing among the appellants. We agree.

A party to a business relationship cannot tortiously interfere with himself. *Baker v. Welch,* 735 S.W.2d 548, 549 (Tex. App.—Houston [1st Dist.] 1987, writ dism'd). Liability must be founded upon the acts of an interfering third party. *Id.* Agents, such as Sielert, Doctors' Hospital, and the named individuals, are generally not regarded as third parties. Rather, an agent's legal identity is that of the principal. Therefore, agents are generally not personally liable for interfering with the principal's business relations. *Id.* The agent and the principal are treated as one because the agent is the principal's alter ego; their financial interest is the same. *Id.* The agent does not interfere with his

---

2. In his cross-appeal one of appellee's points of error complains of the trial court's granting of a partial summary judgment regarding appellee's breach of contract claim. This action by the trial court precluded appellee from presenting a tortious interference with contract claim because the cause of action must be founded upon a valid contract. Appellee's cross-appeal is discussed later in the opinion.

principal's business relationships so long as he acts within the agency's scope, rather than pursues purely personal objectives. *Gonzalez v. Gutierrez*, 694 S.W.2d 384, 388 (Tex.App.—San Antonio 1985, no writ).

Appellee Giurintano's pleadings establish that the individual doctors "are agents and/or employees of Defendant corporations, and at all material times were acting in that capacity." As stated in *Baker*, agents cannot be held liable for interfering with the principal's business relations. Therefore, the individual doctors, as a matter of law, cannot be held liable for tortious interference.[3] The same principles apply to the actions of vice-president Sielert acting as agent for AMI.

■ Further, the Fifth Circuit, applying Texas law, held that a parent and its subsidiary are so closely aligned in business interests as to render them, for tortious interference purposes, the same entity. *Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183 (5th Cir.1985). The court thus ignored the fact that the two were separate entities and held that neither could tortiously interfere with the other because their financial interests were identical, since the parent controlled the subsidiary and its profits. *Id.* at 1196–1197. This analysis by the Fifth Circuit was consistent with the United States Supreme Court's holding that "fully owned subsidiaries are incapable of conspiring with their parent, as a matter of law." *Id.* at 1192, *citing Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). While *Copperweld* concerned the scope of the Sherman Anti-Trust Act and not the common law tort of tortious interference, we are nevertheless persuaded by the factors that caused the Supreme Court and the Fifth Circuit to look to the nature of the underlying relationship. The Supreme Court wrote:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses [sic], but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests.... [I]n reality a parent and a wholly owned subsidiary *always* have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interest.

*Copperweld*, 467 U.S. at 771–771, 104 S.Ct. at 2741–2742 (emphasis in the original).

As to AMI and Doctors' Hospital, the holdings in *Deauville* and *Copperweld* control. AMI acted as the parent for Doctors' Hospital and as principal for the individuals. We have already stated that the principal and agent are treated as one, and therefore neither the principal nor the agent can be held liable for tortious interference with each other. Neither can AMI nor Doctors' Hospital be held liable for interfering with each other because of the parent-subsidiary relationship. Again Giurintano's pleadings established that Doctors' Hospital is a completely owned subsidiary of AMI. As such, they are so closely aligned that it is impossible, as a matter of law, for one to tortiously interfere with the

---

**3.** Appellee Giurintano argues that if an agent is motivated by personal animus or greed, then under Texas law the agent can indeed be held liable for inducing the principal to breach a contract. *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 553 (5th Cir.1981). While we agree with the concept, the court also stated that an agent is privileged to induce a principal to breach a contract when the agent acts qua agent. *Id.*

This means that if the agent, while inducing his principal to breach the contract, was acting in his capacity as an agent, the action is privileged. In this case, the evidence showed that at all material times the individuals were acting in an agency capacity. As stated above, Giurintano's pleadings asserted that the individuals were acting in their capacity as agents.

other. AMI and Sielert's first point of error is sustained and Doctors' Hospital and the individual doctors' first point of error is sustained. Since we have sustained appellants' first points of error it is unnecessary to review AMI and Sielert's second and third points of error and Doctors' Hospital and the individual doctors' second, third, fourth, fifth, and sixth points of error because those points also complain of the jury's findings as to the tortious interference claim.

Appellant AMI next complains that the evidence is legally and factually insufficient to support the jury's findings that AMI tortiously interfered with Giurintano's prospective business relations with future employers.

■ To recover on a cause of action for tortious interference with a prospective business relationship, the plaintiff must show: (1) there was a reasonable probability that he would have entered into a business relationship; (2) the defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming the plaintiff; (3) the defendant was not privileged or justified in his actions; and (4) actual harm or damage occurred to the plaintiff as a result. *Verkin v. Melroy*, 699 F.2d 729 (5th Cir.1983).

■ When both legal insufficiency and factual insufficiency points of error are raised on appeal, the appellate court will address the legal insufficiency or "no evidence" point first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981). In reviewing legal insufficiency or "no evidence" points, the reviewing court considers only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). If there is any evidence of probative force to support the finding, the point must be overruled. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988).

■ Appellee Giurintano's brief maintains that AMI hurt his job chances with outside employers by "deliberately working to prevent Plaintiff from obtaining employment." His argument rests on circumstantial evidence, namely that he sent out over six hundred (600) resumes but failed to receive a job offer despite his high qualifications. He asserts that the jury could have reasonably found from this evidence that but for the interference of AMI, the six hundred resumes sent out would have yielded work.

Viewing only the favorable evidence and the inferences therefrom, in light of the jury's findings, we cannot find any evidence to support Giurintano's contention that but for AMI he would have found work. The only acts done by AMI concerning appellee's search for work were failures to act. First, AMI did not respond to a letter of inquiry regarding Giurintano from an out of state hospital. Giurintano argues that this was an act of tortious interference. Second, AMI left blank part of a reference form sent by the Texas Department of Corrections. Giurintano states that this constitutes an act of tortious interference. This cannot be, and is not, the law in Texas.

If the law were to be as appellee Giurintano argues it to be, then every person and employer would have a duty to respond to unsolicited mail about former employees. Private parties have neither contempt powers nor subpoena authority to make someone respond to questions. The law imposes no duty on anyone to talk about a former employee. A decision that AMI's failure to respond at all, or only in part, constitutes tortious interference would be tantamount to creating a new duty for all employers. This we refuse to do.

Appellee argues that the jury was the best entity to judge AMI's hostility toward him. While true, this statement does not support his conclusion that the jury was free to infer that AMI was tortiously interfering with his prospective business relationships. While a jury is the best judge of the credibility of the witnesses, a jury cannot infer what the evidence does not allow.

Neither silence, hostility, nor a failure to respond is sufficient to support the claim made by appellee Giurintano. AMI and Sielert's *fourth point of error* regarding AMI's tortious interference with appellee's prospective business relations is sustained. Sustaining the fourth point of error makes it unnecessary to discuss AMI and Sielert's fifth point of error.

## II. FRAUD

The jury found that appellants AMI, Sielert, and Doctors' Hospital had committed fraud on Giurintano. The jury was charged on three theories of fraud. If the jury found all the elements of any of the three theories by a preponderance of the evidence, it was authorized to make a fraud finding. The court's charge on fraud read:

> Fraud means (a) the making of a promise to do an act in the future with the intention, desire or purpose of deceiving, and with no present intention of performing it, if such promise or statement is material and is reasonably relied upon by the other party to his injury, or (b) the making of a material statement of fact as a positive assertion, knowing such statement to be false when made or with reckless indifference to whether it is false and made as an assertion of fact, with the intention that such statement would be relied upon by the person to whom the statement was made to his injury, or (c) the intentional or reckless failure to disclose a material fact which, in light of the statements actually made, renders such statements materially misleading, with the intention that such statement would be relied upon by the person to whom the statements were made and he thereby suffered injury.
>
> The intentional or reckless failure to disclose a material fact cannot be found in the absence of a fiduciary relationship. You are instructed that a fiduciary relationship exists between two parties when there is an element of trust necessary from the relationship to accomplish the goals of the relationship or its undertakings. Mere subjective feelings of trust by one party alone are not sufficient to establish a fiduciary relationship.

Representation means the expression or statement of a matter of existing or future fact or circumstances, and may be by words, acts or conduct.

Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question.

For background information on the elements of fraud, *see Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983).

Appellants AMI, Sielert, and Doctors' Hospital first contend that the evidence is legally and factually insufficient to support the jury's findings of fraud. Second, these appellants claim that any fraud action is barred or countered by the at-will employment rule and/or the Statute of Frauds.

As stated above, we will review the "no evidence" contention first, and consider only the evidence and inferences, viewed in their most favorable light, that tend to support the findings. *Davis*, 752 S.W.2d at 522.

The jury charge submitted three versions of fraud. It allowed the jury to find fraud if the evidence established any of the three.

### A. FRAUD WITH INTENT TO DECEIVE

The first theory of fraud required appellee Giurintano to prove that a promise was made to him to do an act in the future, that the promise was made with intent to deceive, and the promise was made with no present intention of performing it. The question before this court is whether appellee presented any evidence to support such a finding against AMI, Sielert, and Doctors' Hospital.

Viewing, in the light most favorable, the evidence that tends to support such a finding, we hold that there was no evidence to support a fraud finding against AMI, Sielert or Doctors' Hospital on the first fraud theory submitted to the jury. The evidence was so weak on this theory of fraud that it did no more that create a mere surmise or

suspicion. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). The only promise made to appellee Giurintano was made by vice-president Sielert. Mr. Giurintano was promised a job at Doctors' Hospital in Laredo, Texas. The evidence showed that when this promise was made, AMI and Sielert (the promisors) had every intention of giving the job to appellee Giurintano. It was only later that it was learned that this would not be possible. But with this theory of fraud it was incumbent upon Giurintano to prove that at the time the promise was made there was never any intention of keeping it. The evidence not only fails to show this; in fact, it shows just the opposite: at the time the promise was made, it was intended to be kept.

## B. FRAUD WITH FALSE STATEMENTS

The second theory employs the familiar six element formulation of *Trenholm v. Ratcliff*, 646 S.W.2d 927 (Tex.1983): (1) a material representation of fact was made; (2) it was false; (3) when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) he made it with the intention that it should be acted upon by the party; (5) the party acted in reliance upon it; and (6) he thereby suffered injury. The second fraud theory required appellee Giurintano to prove that a material statement of fact made to him was known to be false or made with reckless indifference with regard to the truth by the person or entity making the statement. Again, there is no evidence to support such a contention.

Under this theory, Giurintano first had to prove that a material statement of fact was made to him. This was never done. Sielert never made statements of fact to Giurintano. What he did do was make promises about the future that he had every intention of keeping. Without evidence to show that Sielert or anyone else made material factual statements to him, Giurintano cannot prevail on this second theory of fraud.

## C. CONSTRUCTIVE FRAUD

The court also charged the jury on a third fraud theory. This third theory, known as constructive fraud, requires a fiduciary relationship between the parties. The court instructed the jury that it could find this third theory of fraud against AMI, Sielert, and Doctors' Hospital only if it first found that a fiduciary relationship existed between Giurintano and AMI, Sielert, and Doctors' Hospital. The court told the jury that mere subjective feelings of trust alone were insufficient to establish such a relationship. *See Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408, 416 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

A fiduciary relationship exists when the parties are under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation. It exists where a special confidence is placed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one placing confidence. *Gillum v. Republic Health Corp.*, 778 S.W.2d 558, 566 (Tex. App.—Dallas 1989, no writ), *citing Fisher v. Roper*, 727 S.W.2d 78, 81 (Tex.App.—San Antonio 1987, writ ref'd n.r.e.). The definition of a fiduciary relationship also includes informal relationships such as moral, social, domestic, or purely personal relationships that are created by one party placing implicit trust and reliance on another. *See Tuttlebee v. Tuttlebee*, 702 S.W.2d 253, 256 (Tex.App.—Corpus Christi 1985, no writ). However, a fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not, alone, indicate that he placed confidence in another in the sense demanded by fiduciary relationships, because something apart from the transaction between the parties is required. *Gillum*, 778 S.W.2d at 567. Further, when constructive fraud is involved, the complaining party must show a relationship of trust and confidence between the parties. The relationship need not be formal; however, absent the demonstration of a formal fiduciary relationship, the evidence must show that the dealings between the parties

continued for such a time that one party is justified in relying on the other to act in his best interest. *Blue Bell, Inc.*, 715 S.W.2d at 416.

■ In this case the only relationship that existed between Giurintano and the parties he claims committed fraud was a potential employer-employee relationship. There was no evidence introduced to suggest that what occurred between Giurintano and AMI, Sielert, and Doctors' Hospital was anything other than an arms-length deal concerning future employment. It would be fanciful at best to suggest that every time one applies for a job with a potential employer that a fiduciary relationship is created. When a person enters into job negotiations he is looking out for himself while the potential employer is looking out for the needs of the business. Here there was no long term relationship sufficient to allow appellee Giurintano to rely on AMI, Sielert, or Doctors' Hospital to look out for his best interests.

Therefore, after consideration of the evidence on all three fraud theories, we hold that there was no evidence to support the jury's findings of fraud against AMI, Sielert, and Doctors' Hospital. AMI and Sielert's sixth point of error is sustained and Doctors' Hospital's ninth point of error is sustained.

### III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In their seventh point of error appellants Doctors' Hospital, Mata, Godines, Molina, Vasquez, L.O. Mendoza, and L.F. Mendoza contend that the evidence is legally and factually insufficient to support the jury's findings on the issues of intentional infliction of emotional distress.

As stated above, when reviewing legal insufficiency or "no evidence" points, the court shall consider only the evidence and inferences which, when viewed in the most favorable light, tend to support the finding, and shall disregard all evidence and inferences to the contrary. *Davis*, 752 S.W.2d at 522. Further, we must review the legal insufficiency challenge first, and only if the challenge fails must we review the factual insufficiency challenge. *Glover*, 619 S.W.2d at 401.

The Restatement (Second) of Torts § 46 recognizes a cause of action for intentional infliction of severe emotional distress. Section 46(1) provides:

One who by extreme and outrageous conduct causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

Texas courts have followed § 46(1) in a number of cases. *Havens v. Tomball Community Hosp.*, 793 S.W.2d 690 (Tex. App.—Houston [1st Dist.] 1990, writ denied); *Bushell v. Dean*, 781 S.W.2d 652 (Tex.App.—Austin 1989), *rev'd on other grounds*, 803 S.W.2d 711 (Tex.1991); *Tidelands Auto. Club v. Walters*, 699 S.W.2d 939 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.).

■ The Restatement and the Texas cases following it require that four elements be proved before a plaintiff can prevail on such a claim: (1) the defendant acted intentionally or recklessly; (2) the conduct was "extreme and outrageous"; (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe.

In the instant case question number 16 submitted to the jury inquired as follows:

Did any of the listed defendants intentionally inflict severe emotional distress upon Mr. Giurintano?

The court then defined "emotional distress" to mean "any highly unpleasant mental reactions, such as embarrassment, anger, disappointment and worry." The court defined "severe" to mean "that the distress of the plaintiff is so extreme that no reasonable man could be expected to endure it without undergoing unreasonable suffering. It is only where plaintiff's emotional state is extreme that any defendants could be held liable for severe emotional distress."

Similar definitions and instructions had been given by the trial court in *Tidelands* and were approved by the Beaumont Court of Appeals. In the *Tidelands* case the court stated that liability for severe emotional distress arises only where the emotional state is "extreme," which means that the distress inflicted is so severe that no reasonable man could be expected to endure it without undergoing unreasonable suffering. *Tidelands*, 699 S.W.2d at 941. The *Tidelands* court further stated that the tort of intentional infliction of emotional distress, as formulated in the Restatement, requires there be sufficient proof of severe emotional distress, wholly apart from any outrageous conduct on the defendant's part. *Id.* at 944.

The claim of intentional infliction of emotional distress brought by Giurintano against Doctors' Hospital, Homero Mata, and the individual doctors (Godines, Molina, Vasquez, L.O. Mendoza, and L.F. Mendoza) is broad. In his petition Giurintano alleged that:

> ... the actions of all Defendants, as alleged in Plaintiff's other alleged causes of action, were such as to intentionally and/or recklessly inflict emotional distress on Plaintiff and without repeating such actions, are incorporated herein for all purposes.

Further, Giurintano contended that a conspiracy to deny him the job as administrator existed between the parties named above and that through this conspiracy and the actions taken as part of this conspiracy, the defendants intentionally caused him severe emotional distress. The court charged the jury on the law of conspiracy. Thus, Giurintano contended that all actions taken by the defendants were undertaken conspiratorially and designed to cause him emotional distress.

 This court must first, viewing the evidence and inferences therefrom in the light most favorable to the verdict, determine whether there is more than a scintilla of evidence to support the jury's finding that defendants Doctors' Hospital, Mata, Godines, Molina, Vasquez, L.O. Mendoza and L.F. Mendoza intentionally caused Giurintano severe emotional distress. We hold that there is such evidence.

Giurintano testified that he learned that Mata, the assistant administrator at Doctors' Hospital, was spreading rumors about him to the employees of Doctors' Hospital. These rumors stated that once Giurintano became executive administrator he would fire all department heads and supervisors. Giurintano received this information from Ms. Pat McCoy, an employee at the hospital. Other witnesses, hospital employees, heard Mata spreading such rumors and testified to this fact. Mata also told others that Giurintano was a son of a bitch. This was heard by at least two witnesses. Mata also stated to people at the hospital that he planned to organize the doctors into a boycott to back up his desire to keep Giurintano from the position of executive administrator. Manuel Mejia, an employee at Doctors' Hospital during this time, testified that Mata said he planned to get the doctors to call AMI and stop Giurintano's appointment. He further testified that he heard Mata call Giurintano a son of a bitch. When John Villanueva announced Giurintano's appointment as executive administrator at a meeting of the staff, Mata, standing behind Mr. Villanueva and facing the audience, drew his finger across his throat.

Beyond the rumor mongering by Mata, a more direct attack was launched against Giurintano by Drs. Godines, Vasquez, Molina and L.O. Mendoza. This occurred at the cocktail party held in Giurintano's honor. Giurintano was initially approached by Dr. Godines. Dr. Godines accused Giurintano of upsetting the hospital pharmacist and stated that the pharmacist was quitting because of Giurintano. Giurintano denied this and Dr. Godines responded that Giurintano had made a "big fuss" about expired medication and that no one had ever done so before. Almost immediately after this, Dr. Vasquez began a confrontation with Giurintano regarding policy over physician recruitment and patient consent forms. Giurintano testified that Dr. Vasquez "jumped all over him" and raised his voice. Then, Dr. Molina entered the conversation and angrily informed Giurintano that he did not know what the hell he was talking

about regarding patient consent forms and called Giurintano Benito Mussolini. As these doctors continued to follow Giurintano, Dr. L.O. Mendoza entered to make his contribution. This doctor, also a boxing promoter, asked Giurintano if Doctors' Hospital would be buying a certain number of boxing tickets as it usually did. Giurintano stated that due to the financial condition of the hospital this would not be possible. Then, according to Giurintano's testimony, Dr. L.O. Mendoza, in a degrading and insulting tone of voice, asked Giurintano if he was a Jew. When Giurintano responded in the negative, the doctor then inquired as to whether Giurintano was a Nazi or a fascist. Seeing a scar on Giurintano's forehead, Dr. L.O. Mendoza then asked whether or not Giurintano had received a lobotomy as a child. Finally, the doctor told Giurintano to "get away from me you son of a bitch, you won't last in Laredo for two weeks." At this point Giurintano left the room. Giurintano testified that it seemed like this was an organized group of doctors that attacked him, and that when one was finished the other would then jump in and continue the attack.

The night after the cocktail party Giurintano attended a dinner party attended by board members and some hospital staff. As they sat down to dinner, Dr. L.F. Mendoza asked Giurintano if he was aware of how may physicians he had offended at the cocktail party. Then, in what Giurintano described as an aggravating manner, began to "drill" Giurintano on recruitment procedures. Giurintano stated that this doctor was trying to start an argument with him until one of the board members, Judge Benevides, put a stop to it. Dr. L.F. Mendoza is a cousin of Dr. L.O. Mendoza. Giurintano also testified that Dr. L.F. Mendoza called him a mother f_____.

Dr. Roger Keene testified that after the cocktail party he was asked by Drs. Godines, Molina, L.O. Mendoza and L.F. Mendoza to call a special staff meeting. Sielert was asked to attend this special meeting. At the meeting, the above mentioned doctors used the "incident" at the cocktail party as examples of Giurintano's alleged volatility and inability to communicate.

Dr. Keene testified that it was his understanding that the reconsideration of Giurintano for the position of executive administrator spawned from the problems at the cocktail party. Dr. Keene was told by Dr. Godines and both Dr. Mendozas that they would not admit patients to Doctors' Hospital if Giurintano was appointed as executive administrator. Dr. Keene testified that Dr. Godines wrote a letter to Sielert regarding Giurintano's appointment. That letter was not sent, however, because the information in the letter was ultimately discussed with Sielert personally. By the end of the special meeting, a voice vote was held in which the staff decided that Giurintano was not acceptable as executive administrator, even on an interim basis as was suggested by Sielert.

Sielert testified that he had to confront Mata and tell him to stop spreading rumors about Giurintano. Mr. Sielert also testified that Mata, Godines, Vasquez and L.F. Mendoza voiced concerns about the appointment of Giurintano as executive administrator.

Taken separately each incident, comment or confrontation would seem to belie the existence of outrageous conduct on the part of the appellants. However, when taken together and considered in context and the appropriate time frames, there is circumstantial evidence of a conspiracy on the part of the appellants to intentionally put Giurintano in confrontational situations and use his responses to these confrontations for the purpose of opposing his appointment. These actions along with the conduct of Mata, an agent of Doctors' Hospital, constitute outrageous conduct on the part of the appellants. There is more than a scintilla of evidence to support this finding. As to Doctors' Hospital, the jury could have implicitly found that it ratified the conduct of Mata, an employee, by allowing these actions to culminate in the termination of Giurintano and was thus liable for intentional infliction of severe emotional distress.

As to whether or not Giurintano suffered emotional distress that was severe, we also

find that more than a scintilla of evidence exists. Giurintano testified that he felt like everything had fallen apart. He felt lost. He had lost his job and his home. He felt confused and dazed. Giurintano also testified that as a result of what had happened he was depressed and frustrated and that he asks himself everyday if it is worth going on living. Friends and former co-workers testified that Giurintano looked older, grayer and thinner than he had before. They also testified that he no longer seems like the upbeat and enthusiastic person he once was and that he was very dejected and depressed. Larry Fitzgerald, a vice president for AMI, testified that after Giurintano lost the job he was "very distraught." There is more than a scintilla of evidence showing that Giurintano suffered severe emotional distress.

■ While the elements of outrageous conduct and severe distress are separate, the two are related. For although the severe distress must be proved, in some cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. Restatement (Second) of Torts § 46 comment j (1965). We find this to be true in this case. Thus, after viewing the evidence in the light most favorable to the jury's findings, we hold that there is more than a scintilla of evidence to support the jury's findings that the appellants intentionally inflicted severe emotional distress on Giurintano. Therefore, appellants "no . evidence" challenge fails. Since we have found evidence to support the complained of finding, we will now review appellant's claim of factual insufficiency.

■ In reviewing a factual insufficiency challenge the court of appeals must examine all of the evidence. *Lofton v. Texas Brine Corp.,* 720 S.W.2d 804, 805 (Tex.1986). After considering and weighing all of the evidence, the appellate court will set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

The evidence in favor of the jury's verdict was set out in detail in the discussion of appellants' "no evidence" challenge. We will now consider the opposing evidence. As to the outrageous conduct on the part of the appellants, the individuals denied any knowledge of threatened boycotts or any organized attack on Giurintano. Mata denied opposing Giurintano's appointment to the position of executive administrator. Witness Carlos O'Choa testified that while he originally told Giurintano's counsel that Mata was spreading rumors opposing Giurintano, he believed he was mistaken and had misinterpreted what Mata had said. Thus, we have a classic swearing match: Giurintano and others swear appellants did and the appellants swear they did not. The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Rego v. Brannon,* 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The jury was entitled to believe Giurintano and to disbelieve appellants. A court of appeals may not substitute its opinion for that of the trier of fact merely because it might have reached a different conclusion. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988).

As to appellants' contention that the evidence is factually insufficient for the jury to have found that Giurintano suffered severe emotional distress we again have conflicting evidence. Appellants point to the fact that Giurintano told Sielert and L.F. Mendoza that the incident at the party was not really a problem and did not voice any real complaints. Appellants argue that when asked if the remarks at the party upset him Giurintano stated that rather than being upset he was surprised that such remarks would be made by educated persons. However, Giurintano's claim of intentional infliction of severe emotional distress was not based solely on the acts that took place at the cocktail party. His claim encompasses the range of actions undertaken by the appellants. Further, as stated above, Giurintano testified that he was not sure if he wished to go on living and that he was depressed and frustrated.

This testimony was supported by testimony from friends and former co-workers who testified to the drastic changes in Giurintano's personality and physical appearance. Again, we cannot substitute our judgment for that of the jury. Having considered and weighed all of the evidence, we hold that the evidence is not so weak nor the jury's finding so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Appellants' factual insufficiency challenge is overruled. On the intentional infliction of severe emotional distress claim, judgment will be rendered for appellee Benito Giurintano in the amounts set forth below for actual and exemplary damages, plus appropriate prejudgment and postjudgment interest. The seventh point of error of Doctors' Hospital, Homero Mata, Dr. Godines, Dr. Vasquez, Dr. Molina, Dr. L.O. Mendoza and Dr. L.F. Mendoza is overruled.

## IV. CROSS–APPEAL BY GIURINTANO

Before this cause came to a trial on the merits, the trial court granted summary judgment in favor of the appellants as to certain claims brought by appellee Giurintano. Appellee disagrees with the trial court's ruling and brings a cross-appeal. However, appellee says in footnote one of his supporting brief that the cross-appeal need not be addressed unless the Court reverses the case on the main appeal or orders a remittitur to less than $1,000,000. As this court has done neither, we will not address appellee's cross-appeal.

The judgment of the trial court will be reversed; and, pursuant to TEX.R.APP.P. 80(b)(3) judgment will be rendered that the court below should have rendered.

The judgment rendered by this court will provide that Benito Giurintano have recovery jointly and severally against Doctors' Hospital of Laredo, Inc., Homero Mata, Reynaldo Godines, Jose E. Molina, Winder N. Vasquez, Louis F. Mendoza and L.O. Mendoza for actual damages for intentional infliction of severe emotional distress in the amount of $500,000.

The judgment of this court will also provide that Benito Giurintano recover exem-plary damages, in addition to actual damages, for intentional infliction of severe emotional distress, from the following named appellants in the amounts shown:

| | |
|---|---|
| Doctors' Hospital of Laredo, Inc. | $500,000 |
| Homero Mata | $500,000 |
| Reynaldo Godines | $100,000 |
| Jose E. Molina | $100,000 |
| Winder N. Vasquez | $100,000 |
| Louis F. Mendoza | $ 20,000 |
| L.O. Mendoza | $100,000 |

The judgment of this court will also provide that Benito Giurintano recover nothing from either American Medical Enterprises, Inc. or John R. Sielert.

The judgment of this court will also provide that Benito Giurintano recover jointly and severally from Doctors' Hospital of Laredo, Inc., Homero Mata, Reynaldo Godines, Jose E. Molina, Winder N. Vasquez, Louis F. Mendoza and L.O. Mendoza prejudgment interest on $250,000, being the amount awarded to Benito Giurintano for past emotional distress, at the rate of 10% per annum from September 25, 1985, six months after March 25, 1985 until December 29, 1988, the date of the judgment in the trial court. Said prejudgment interest will be in the total amount of $81,507.

The total amounts awarded in this court's judgment will bear interest at the rate of 10% per annum from December 29, 1988 until paid.