TARLETON STATE UNIVERSITY, Barry B. Thompson, and Johnny M. Johnson, Appellants,

v.

Randy E. ROSIERE, Appellee.

No. 11–92–245–CV.

Court of Appeals of Texas, Eastland.

Dec. 30, 1993.

Rehearing Denied Feb. 3, 1994.

James C. Todd, Austin, for appellants.

Shane Goetz, Rossetti & Goetz, Daniel A. Ortiz, Ortiz & Robinson, Arlington, for appellee.

DICKENSON, Justice.

After Randy E. Rosiere was denied tenure, he sued: Tarleton State University (TSU), his former employer; Barry B. Thompson, individually and as president of TSU; and Johnny M. Johnson, vice-president for student services at TSU. Rosiere alleged that he was denied tenure because he exercised his first amendment right to free speech[1] when he spoke out against the president's proposal to sell a ranch which belonged to the university. The jury found that TSU and Thompson arbitrarily denied appellee's application for tenure, that Thompson intentionally inflicted emotional distress upon appellee, and that Thompson and Johnson tortiously interfered with appellee's future business relationship with TSU. The jury awarded: $111,651 for appellee's economic loss; $5,000 for his "Pain and Suffering, Mental Anguish, Embarrassment, Humiliation or Severe Emotional Distress"; $5,000 for the damage

---

1. The "protected speech" claim is pending in the United States District Court for the Northern District of Texas. The federal jury returned a verdict for Rosiere in the total amount of $1,516,104.

to his reputation; and $34,014 in exemplary damages. The trial court rendered judgment on the verdict for a total recovery of $155,665. We reverse and render.

## Points of Error

Appellants assert six points of error, and appellee argues one cross-point. In their first and second points of error, appellants argue that the trial court erred in asking the jury whether Thompson acted "arbitrarily" in denying appellee's application for tenure because: (Point No. 1) he had "no property interest" in his application for tenure; and (Point No. 2) there was evidence of a rational basis for the decision. In the third point of error, appellants argue that the trial court erred in asking the jury if there was any "rational basis" for Thompson's decision to deny tenure because this was a "strictly legal issue" for the court to decide. Appellants argue, in the fourth point of error, that the trial court erred in asking the jury if Thompson had intentionally inflicted severe emotional distress upon appellee because there was "no evidence of outrageous conduct or severe emotional distress." In the fifth and sixth points of error, appellants contend that the trial court erred in asking the jury if there was tortious interference by Thompson and Johnson with a prospective contractual relationship because: (Point No. 5) there was no prospective contractual relationship between appellee and TSU; and (Point No. 6) their actions were privileged as a matter of law. In appellee's cross-point, he argues that the trial court should have reinstated him with tenure, rather than merely reinstating him on the tenure track.

## Background Facts

After having been denied tenure at the University of California at Berkeley, appellee was hired by TSU to teach range management. Appellee was put on a four-year tenure track, during which time he received year-to-year contracts. At the appropriate time, appellee completed his dossier and applied for tenure. Appellee was recommended for tenure by an ad hoc departmental review committee (which made suggestions for improvement), the school review committee, and the administrative review committee; and he was recommended (with reservations) by the vice-president for academic affairs. Thompson, however, had the ultimate authority to decide whether appellee would be recommended for tenure, and his recommendation to the board of regents was that appellee not be given tenure.

Appellee contends that the denial of his application for tenure stemmed from the exercise of his first amendment rights regarding the sale of the Hunewell Ranch.[2] Thompson had mentioned that the sale of that ranch was a "possibility." Appellee thought that the sale of the ranch would be detrimental to TSU's agricultural program. He expressed this opinion in a memo dated February 17, 1988, to the dean of agriculture and business (who filed the memo and did not send it to Thompson). Appellee also expressed this opinion in March of 1988 during a discussion with Vice-President Johnson at a Future Farmers of America contest which was chaired by Johnson. Appellee initiated the discussion, and he spoke in a rather loud voice as he told of his opposition to the possible sale of the ranch. Johnson had been a professor in the agriculture department before he became vice-president. Johnson did not feel that it was the proper time or place for them to discuss the president's plan for the sale of that ranch. Johnson later went to Thompson and told him that appellee had "just jumped me out" over the proposed sale of the ranch.

## Substantive Due Process

■ In the first three points of error, appellants argue that the trial court erred in submitting jury questions concerning the de-

2. See Footnote No. 1.

nial of tenure.[3]  In the first point, appellants contend that the issue of arbitrariness should not have been submitted because appellee had "no property interest" in tenure.  We agree.

In order to review these "no evidence" points of error, we must determine whether there is any evidence to support the questions. *Elbaor v. Smith*, 845 S.W.2d 240 (Tex. 1992); *Brown v. Goldstein*, 685 S.W.2d 640 (Tex.1985); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965).  See also *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.*, 793 S.W.2d 660 at 666 (Tex.1990).  There is no evidence that appellee's relationship with TSU created a property interest in a tenured position.[4] The record shows that appellee was hired as a professor on the "tenure track" who would be eligible for consideration for tenure at the end of four years.  There is nothing in the record to show that appellee had an entitlement to tenure, an implied promise of continued employment, or a tenure-like position with TSU.  See *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Courtney v. University of Texas System*, 806 S.W.2d 277 (Tex.App.— Fort Worth 1991, writ den'd).  The only property interests revealed in the record were (1) appellee's right to teach at TSU through the school year following notification of the denial of tenure and (2) appellee's right, upon alleging that he was denied tenure in retaliation for his exercise of first amendment rights, to the due process procedures found in the faculty handbook.[5]  Appellee was not denied these rights.  The first point of error is sustained.

■  We also find that the record conclusively establishes that there was in fact a "rational academic basis" for the denial of tenure.  Appellee had previously failed to achieve tenure in his prior academic employment;  the recommendation for tenure from the ad hoc review committee had been made with "suggestions for improvement";  and the recommendation for tenure from the academic vice-president had been made "with reservations."  As president, Thompson was charged with the ultimate responsibility as to whether or not to recommend to the Board of Regents that they grant tenure to an academic employee.  Consequently, the second and third points are sustained.

*Intentional Infliction of Emotional Distress*

■  In the fourth point of error, appellants argue that the trial court erred in submitting the issue regarding intentional infliction of severe emotional distress upon appellee because there was no evidence that the conduct was extreme and outrageous.  The elements of the tort of intentional infliction of emotional distress are:  (1) the defendant acted intentionally or recklessly;  (2) the conduct was extreme and outrageous;  (3) the actions of the defendant caused the plaintiff emotional distress;  and (4) the emotional distress suffered by the plaintiff was severe.  *Wornick Company v. Casas*, 856 S.W.2d 732 (Tex.1993); *Twyman v. Twyman*, 855 S.W.2d 619 (Tex.1993); Restatement (Second) of Torts § 46 (1965).  According to Section 46, comment d, which is partially quoted in *Wornick* and *Twyman:*

> [L]iability [exists] only where the defendant's conduct has been extreme and out-

---

**3.**  The jury found in answer to Question No. 1(A) that Thompson acted "arbitrarily" in denying appellee's application for tenure.  The jury found in answer to Question No. 1(B) that Thompson did not rely on "any rational academic basis" for his decision to deny appellee's application for tenure.

**4.**  According to the faculty handbook, "tenure" means:
> [T]he entitlement of faculty members to continue in their academic positions unless dismissed for good cause.

There is no "good cause" requirement when denying an application for tenure.

**5.**  See and compare *Grounds v. Tolar Independent School District*, 856 S.W.2d 417 (Tex.1993), which discusses a public high school coach's "property interest" under the Term Contract Nonrenewal Act, TEX.EDUC.CODE § 21.201 et seq. (Vernon 1987 & Supp.1994).

rageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice".... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

■ It is for the court to determine whether the conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Twyman v. Twyman, supra* at 625. Where reasonable men may differ, it is for the jury to determine. In *Wornick*, an employee sued her former employer for intentional infliction of emotional distress after she was discharged and escorted off the premises by a security guard. The employee alleged that her employer terminated her in order to prevent her from revealing information to government auditors concerning the unethical practices of her coworkers. The court upheld a summary judgment in favor of the employer and held that, as a matter of law, neither the employer's discharge of the employee nor the manner of her discharge was outrageous. We find the rationale in *Wornick* to be dispositive of the instant case; consequently, we hold that, as a matter of law, Thompson's conduct in refusing to recommend tenure for appellee was not outrageous. See and compare *Qualicare of East Texas, Inc. v. Runnels*, 863 S.W.2d 220 (Tex.App.—Eastland 1993, writ dism'd by agr.). Appellants' fourth point of error is sustained.

### Tortious Interference

■ In the fifth and sixth points, appellants urge that the trial court erred in submitting the issue of tortious interference with appellee's future business relationship with

TSU. In the fifth point, appellants assert that there was no prospective contractual relationship between appellee and TSU. We disagree. Appellee showed a reasonable probability of entering into a future business relationship with TSU. The fifth point of error is overruled.

■ In the sixth point, appellants argue that appellee did not have a contract guaranteeing tenure, that there was no third-party interference, and that Thompson's and Johnson's actions were privileged. The record is clear that appellants did not interfere with appellee's existing contractual relationship. However, Texas law protects both existing and prospective contracts from interference by third parties. *Juliette Fowler Homes, Inc. v. Welch Associates, Inc., supra; Sterner v. Marathon Oil Company*, 767 S.W.2d 686 (Tex.1989). The elements of tortious interference with a prospective business relationship are: (1) there was a reasonable probability of entering into a business relationship; (2) the defendant acted maliciously by intentionally preventing the relationship from occurring, with the purpose of harming the plaintiff; (3) the defendant was not privileged or justified;[6] and (4) actual harm or damages resulted. *American Medical International, Inc. v. Giurintano*, 821 S.W.2d 331 (Tex.App.—Houston [14th Dist.] 1991, no writ); *Exxon Corporation v. Allsup*, 808 S.W.2d 648 (Tex.App.—Corpus Christi 1991, writ den'd); *Gillum v. Republic Health Corp.*, 778 S.W.2d 558 (Tex.App.—Dallas 1989, no writ).

■ We hold that Thompson did not tortiously interfere with appellee's future business relationship with TSU. Liability for tortious interference can only be had against third parties. *American Medical International, Inc. v. Giurintano, supra at 335; Baker v. Welch*, 735 S.W.2d 548 (Tex.App.— Houston [1st Dist.] 1987, writ dism'd); Restatement (Second) of Torts § 766B (1979).

---

**6.** Although the Texas Supreme Court ruled that the privilege of legal justification or excuse is an affirmative defense to tortious interference with a contractual relationship in *Sterner v. Marathon*

*Oil Company, supra,* the jury in this case was charged that it was an element of tortious interference with a future business relationship.

In *American Medical International, Inc.* (AMI), the vice-president of AMI and the assistant administrator and several doctors at Doctors' Hospital (which was owned by AMI) were sued for tortiously interfering with Giurintano's business relationship. Giurintano was to fill the vacant position of administrator at Doctors' Hospital. The assistant administrator and the named doctors organized themselves against Giurintano. They insulted Giurintano, harassed him, and drew him into argumentative situations at a party in Giurintano's honor; and they spread rumors that Giurintano would fire the department heads. Later that month when Giurintano arrived in Laredo to begin his new job, AMI's vice-president told him not to report to work because of the opposition to him at Doctors' Hospital. The court of appeals held that the doctors, the assistant administrator, and Doctors' Hospital were agents, rather than third parties, to the prospective business relationship between Giurintano and AMI and that they could not be personally liable for interfering with AMI's business relations.

This reasoning is applicable to the present case. As president of TSU, Thompson had the duty to either recommend appellee for tenure to the Board of Regents or deny appellee's application for tenure. Thompson denied appellee's application. The record establishes as a matter of law that Thompson was engaged in the course and scope of his employment for TSU. We hold that, as an agent of TSU, Thompson is not liable as a third-party interferer.

 The record shows that Johnson's acts were justified as a matter of law. The only act of "interference" committed by Johnson was informing the president of TSU about an incident that occurred at a school-sponsored function which was designed to recruit students by promoting good public relations with high school students and their parents. Although Johnson had no official role in the tenure process, he was employed by TSU as vice-president for student services; as such, he had an interest in TSU's public relations. Johnson did not improperly interfere with appellee's prospective business relationship with TSU by informing the president of TSU about appellee's behavior at a school function. See, e.g., Restatement (Second) of Torts § 770, cmt. b, illus. 3 and § 772, cmt. b (1979) (stating that an employee who notifies his employer about a fellow employee's conduct does not improperly interfere and that recounting truthful information is not an improper interference).[7] The sixth point of error is sustained.

### Appellee's Cross-Point

In his cross-point, appellee argues that the trial court erred in failing to reinstate him as a tenured professor, rather than a professor on the tenure track. Because we reverse and render judgment that appellee take nothing, appellee's cross-point is moot.

The judgment of the trial court is reversed, and this court renders judgment that appellee take nothing.

---

7. There is no evidence to support the jury's finding that Johnson acted maliciously.