**UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON; William Mileski, M.D.; and Martha Shelver, R.N., Appellants,**

v.

**Stephanie HOHMAN, R.N. and Lisa Lippert, R.N., Appellees.**

No. 01–98–01382–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 24, 1999.

Merle Hoffman Dover, Toni Hunter, John Cornyn, Austin, for appellants.

Joyce A. Keating, Houston, Eddie M. Krenek, Katy, for Stephanie Hohman.

Panel consists of Justices HEDGES, ANDELL, and PRICE.*

## OPINION ON REHEARING

HEDGES, Justice.

On this day, the Court considered appellant's motion for rehearing. The motion is DENIED. However, we withdraw our opinion of August 31, 1999, and issue this opinion in its stead. Our judgment of August 31, 1999 remains unchanged.

University of Texas Medical Branch at Galveston (UTMB) brings this interlocutory appeal from the denial of its plea to the jurisdiction, based on sovereign immunity. William Mileski, M.D., and Martha Shelver, R.N., employees of UTMB, bring their interlocutory appeals from the trial court's denial of their motions for summary judgment, based on official immunity.[1]

## BACKGROUND

Appellees, Stephanie Hohman and Lisa Lippert (the nurses), are registered nurses who worked in the emergency room at UTMB. Dr. Mileski was the chief of trauma and co-director of emergency services, and Shelver was the nurse manager for the emergency room nurses. Dr. Mileski was hired to upgrade emergency room procedures so UTMB would qualify as a level one trauma center.

In their petition, the nurses allege that, after Mileski took over the emergency room, they noticed a pattern of classifying patients as "trauma evaluation" patients, which resulted in the patients being "subjected to a myriad of painful, unwanted, and at times unnecessary procedures, to which the patients refused, resisted, and/or to which they unknowingly submitted based on false information that the procedure was necessary to preserve their health." The nurses voiced their concerns to the UTMB administration, the Texas Department of Health, the Board of Nurse Examiners, and the UTMB police. They contend that as a result of their reports, UTMB retaliated against them to such a degree that they were forced to resign.

The nurses then filed suit, alleging violations of the Whistleblower Act as well as certain other common-law torts.

## PLEAS TO THE JURISDICTION

### A. Standard of Review

When a lawsuit is barred by sovereign immunity, dismissal with prejudice for want of jurisdiction is proper. *Liberty Mut. Ins. Co. v. Sharp*, 874 S.W.2d 736, 739 (Tex.App.—Austin 1994, writ denied). "In deciding whether to grant a plea to the jurisdiction, the trial court must look solely to the allegations in the petition." *Id.* Our task is not to determine whether the plaintiffs ultimately win or lose upon judicial review; rather, our task is to examine the petition, to take as true the facts pleaded, and to determine whether those facts support jurisdiction in the trial court. The allegations in those pleadings are to be

---

* The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. We have jurisdiction over UTMB's appeal pursuant to Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(8) (Vernon Supp.1999), which allows a governmental unit to appeal an order denying its plea to the jurisdiction. We have jurisdiction over Mileski's and Shelver's appeals pursuant to Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(5) (Vernon Supp.1999), which allows an individual who is an employee of the state to appeal the denial of a summary judgment based on an assertion of immunity.

construed in favor of the plaintiff. *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex.1993).

## B. Sovereign Immunity on Whistleblower Claims

In issue number one, UTMB contends that the trial court erred in denying its plea to the jurisdiction on the nurses' whistleblower claims. Specifically, UTMB contends that it is entitled to sovereign immunity on these claims because the nurses (1) suffered no "adverse personnel action" as that term is defined by the Whistleblower Act; (2) failed to bring their Whistleblower claims within the applicable statute of limitations; and (3) failed to exhaust their administrative remedies.

■ The Whistleblower Act contains a waiver of the state's sovereign immunity. TEX. GOV'T CODE ANN. § 554.035 (Vernon Supp.1999). Thus, the issue this Court must decide is whether the nurses' pleadings state a cause of action falling within the Whistleblower Act's waiver of sovereign immunity.

### 1. Is constructive discharge an "adverse personnel action" or "termination"?

■ UTMB first contends that the nurses' pleadings are inadequate to state a claim under the Whistleblower Act because the petition concedes that they resigned and were not fired.[2] UTMB argues that a "constructive discharge" is not an "adverse personnel action" as defined by the Whistleblower Act. We disagree.

The Whistleblower Act provides:

(a) A state or local governmental entity may not *suspend* or *terminate* the employment of, *or take other adverse personnel action* against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority.

TEX. GOV'T CODE ANN. § 554.002(a) (Vernon Supp.1999) (emphasis added).

"Adverse personnel action" is defined as an "action that affects a public employee's compensation, promotion, demotion, transfer, work assignment, or performance evaluation." TEX. GOV'T CODE ANN. § 554.001(3) (Vernon Supp.1999).

We disagree with UTMB's analysis. The issue is not whether there was an

---

2. The nurses' petition alleges retaliation in the following paragraphs:

Defendants retaliated against Plaintiffs for reporting the illegal acts and violations, and for refusing to participate and go along with the illegal acts. Forms of retaliation include, but are not limited to, threats or notices of suspension, reprimands, poor performance reviews inconsistent with performance, verbal harassment, threats, and failure to promote. Hohman and Gray [Lippert] repeatedly prepared and presented the appropriate management staff with "issues and concerns" reports, outlining inappropriate patient care treatment as discussed herein. Gray was harassed and intimidated on a daily basis, which included, but is not limited to, denial of lunch and restroom breaks, chastisement for going to the bathroom during a shift, false accusations of improper conduct, failure to appoint Gray as charge nurse thus denying her valuable experience, verbal harassment, threats, and withholding of evaluations thus holding up merit and promotion raises. Plaintiffs were treated in a demeaning and

threatening manner because they brought their complaints to the attention of management.

. . . .

Because of those reports and the nurses' actions in attempting to halt the illegal acts and the improperly instituted invasive and overly aggressive procedures, the nurses were subjected to retaliation such as reprimands, sudden work shift changes, written reprimands, frequent personal confrontations with management level personnel, attempts to discredit the nurses professionally, poor performance reviews, verbal harassment, threats and additional adverse employment conditions.

The illegal and unethical conduct and harassment continued despite their complaints until both Plaintiffs were forced to resign under the pressure of continued violations of patients' rights, constant harassment and personal attacks, the futility of the internal grievance process, severely detrimental work conditions, and mounting retaliation to which no reasonable person would continue to subject themselves.

"adverse personnel action." The issue is whether a constructive discharge is a "termination." We believe that it is.

In *Nguyen v. Technical & Scientific Application, Inc.*, 981 S.W.2d 900, 901 (Tex. App.—Houston [1st Dist.] 1998, no pet.), this Court was asked to decide whether an employee who was constructively discharged, but not fired, had a *Sabine Pilot* [3] cause of action. We held that a constructive discharge was sufficient to fulfill the "firing" requirement of the *Sabine Pilot* exception, noting, "[w]e doubt the Texas Supreme Court intended to permit employers to avoid liability by coercing resignations from, rather than firing, their employees who refused to break the criminal law." *Id.* at 902.

Although the Whistleblower Act is a statutory cause of action for wrongful discharge, rather than a common-law exception to the employment-at-will doctrine, we nonetheless find the reasoning of *Nguyen* persuasive. The legislature could not have intended to provide a cause of action to employees who were fired for reporting violations of the law, while at the same time excluding employees who were coerced into resigning.

"Constructive discharges" have been held to meet the termination or firing element in several other types of cases. *See Junior v. Texaco, Inc.*, 688 F.2d 377, 378 n. 3 (5th Cir.1982) (constructive discharge is legal substitute for discharge element in discrimination cases under Title VII of Civil Rights Act of 1964); *see also Passons v. University of Tex.*, 969 S.W.2d 560, 562 (Tex.App.—Austin 1998, no pet.) (constructive discharge meets discharge element of Tex. Lab.Code Ann. § 21.051 (Vernon 1996)); *see also Davila v. Lockwood*, 933 S.W.2d 628, 630 (Tex.App.—Corpus

Christi 1996, no pet.) (assuming constructive discharge met discharge requirement under Tex. Lab.Code Ann. § 451.001 (Vernon 1996), which prohibits firing for filing worker's compensation claim).

■ We hold that by pleading that they were constructively discharged, the nurses have met the "termination" requirement of the Whistleblower Act. A question of fact remains for the jury to decide whether the nurses were, in fact, constructively discharged.

**2.' Statute of limitations**

■ UTMB also argues that even if pleading a constructive discharge is sufficient under the Whistleblower Act, the nurses filed their petition outside the applicable statute of limitations, which provides:

> Except as provided by Section 554.006, a public employee who seeks relief under this chapter must sue not later than the 90th day after the date on which the alleged violation of this chapter:
>
> (1) occurred; or
>
> (2) was discovered by the employee through reasonable diligence.

Tex. Gov't Code Ann. § 554.005 (Vernon 1994).

UTMB argues that limitations began to run from the instant the nurses believed they were being retaliated against. Pointing to several discreet acts leading up to the nurses' resignations, UTMB contends that the nurses have filed their suit too late.[4] The nurses respond that their suits were timely because they were filed within 90 days of the date they were constructively discharged. We must decide what action is "the alleged violation" of the Whistleblower Act: the first of the alleged

---

**3.** Under *Sabine Pilot Serv., Inc. v. Hauck*, 687 S.W.2d 733, 734 (Tex.1985), an employee fired for refusing to perform an illegal act can sue for wrongful discharge.

**4.** UTMB argues that Hohman's limitations began to run with the July 29, 1996 personnel evaluation, which means her suit should have

been filed on or before October 28, 1996. UTMB argues that Lippert's limitations began to run on September 6, 1996, when she was reprimanded for being inattentive to a patient, which means that her suit should have been filed by December 5, 1996. Both nurses filed suit on January 6, 1997.

retaliatory acts or the constructive discharge.

Having held that constructive discharge is a "termination" under the Whistleblower Act, it follows that "the alleged violation" giving rise to the nurses cause of action is, necessarily, the constructive discharge itself. Therefore, the nurses were required to bring their suit within 90 days of the date they were allegedly constructively discharged.

A constructive discharge occurs when an employer makes conditions' so intolerable that an employee reasonably feels compelled to resign. *Passons,* 969 S.W.2d at 562; *Davila,* 933 S.W.2d at 630. In *Davila,* the court held that the plaintiff's claim for constructive discharge arose at the time that he tendered his resignation because, by that date, he had decided that "conditions were so intolerable that he felt compelled to resign." *Id; see also Stroud v. VBFSB Holding Corp.,* 917 S.W.2d 75, 80–81 (Tex.App.—San Antonio 1996, writ denied) (*Sabine Pilot* cause of action alleging constructive discharge accrued when plaintiff tendered resignation).

The record in this case shows that Lippert tendered her resignation on October 23, 1996, which was to take effect November 6, 1996. Hohman tendered two letters of resignation, one dated October 28, 1996, and one dated November 1, 1996. Both provide an effective date of November 15, 1996. The record does not show Lippert's last day of work, though presumably it was in November 1996; Hohman's last day of work was November 3, 1996.

Regardless of when the nurses actually left the employment of UTMB, we hold that their constructive discharge claims accrued on the dates they submitted their resignations. By those dates, they were aware that conditions had become intolerable and that they felt compelled to resign. Both nurses filed suit on January 6, 1997, within 90 days of the date they tendered their resignations. Thus, their Whistleblower claims are timely.

### 3. Exhaustion of Administrative Remedies

Finally, UTMB argues that the nurses cannot assert whistleblower claims because they did not initiate administrative appeal procedures. A public employee must initiate action under the grievance or appeal procedures of the employing state entity relating to suspension or termination of employment before suing under the Whistleblower Act. *See* Tex. Gov't Code Ann. § 554.006(a) (Vernon Supp.1999). The employee must invoke the applicable grievance or appeal procedures not later than the ninetieth day after the date on which the alleged violation occurred. *See* Tex. Gov't Code Ann. § 554.006(b) (Vernon Supp.1999). When a party sues under a statutory cause of action, the party must comply with the administrative prerequisites, which are jurisdictional. *Gregg County v. Farrar,* 933 S.W.2d 769, 777 (Tex.App.—Austin 1996, writ denied). Under the Whistleblower Act, the legislature intended that the governmental entity be afforded the opportunity to correct its errors by resolving disputes before facing litigation. *Id.* at 775.

On December 3, 1996, the nurses' attorney sent a letter to UTMB that informed UTMB of the nurses' constructive discharge claims, and provided in pertinent part:

> I understand that UTMB's employment manual provides that "no remedy or corrective [is] available under the grievance policy once an individual ceases to be a UTMB employee." Nonetheless, a copy of this letter is being sent to the UTMB official in charge of grievances in order to provide continuing notice of her grievance against UTMB and provide the University with an opportunity to respond and remedy the situation if it so desires. If you have any questions, please do not hesitate to call me.

No administrative remedial action was taken by UTMB.

UTMB contends that this letter came too late. Specifically, UTMB points to several of the earlier alleged retaliatory acts, and contends that grievances should have been filed then.[5] However, as we stated in the previous section, the "alleged violation" in this case is not any one particular retaliatory act, but the constructive discharge itself. Thus, the nurses had 90 days from their constructive discharges (or, in this case, the date of their resignations) to initiate a grievance procedure. The December 3, 1996 letter to the UTMB official in charge of grievances fell within the 90 day period.

 UTMB also argues that the letter was not a clear intent to invoke the grievance procedure. We disagree. When it is unclear whether the employer has a post-termination grievance procedure, or it is unclear what the procedure is, and the terminated employees timely notify the employer that they are invoking the grievance procedure, terminated employees have adequately implicated the grievance procedures. *See Beiser v. Tomball Hosp. Auth.*, 902 S.W.2d 721, 724 (Tex.App.—Houston [1st Dist.] 1995, writ denied). In this case, the letter was sufficient to put UTMB on notice that the nurses were seeking some type of administrative relief in connection with their alleged constructive discharges.

We hold that the nurses timely and effectively initiated administrative remedies under the Whistleblower Act.

### 4. Conclusion

Because the nurses have (1) initiated a grievance and filed suit in a timely manner, and (2) properly pled a cause of action under the Whistleblower Act, the waiver of sovereign immunity in the Whistleblower Act applies. Thus, the trial court properly

denied UTMB's plea to the jurisdiction on the nurses' whistleblower claims.

We overrule issue one.

### C. Sovereign Immunity as to Claims under the Nurse Reporting Act

 In issue three, UTMB contends that the trial court erred in denying its plea to the jurisdiction on Hohman's claim that she was retaliated against for making a report under the Nurse Reporting Act.[6] Specifically, UTMB contends that the Nurse Reporting Act does not contain a clear and unambiguous waiver of sovereign immunity. In issue four, defendant Shelver contends that, in her official capacity, she is also entitled to immunity on Hohman's claims under the Nurse Reporting Act. A suit against a government employee in her official capacity is, in all respects, a suit against the State; therefore, the employee sued in her official capacity is shielded by sovereign immunity. *See Whitehead v. University of Tex. Health Science Ctr. at San Antonio*, 854 S.W.2d 175, 180 (Tex.App.—San Antonio 1993, no writ). Accordingly, we will discuss issues three and four together.

### 1. Does the Nurse Reporting Act Contain a Waiver of Sovereign Immunity?

 The waiver of governmental immunity is a matter addressed to the Legislature. *City of LaPorte v. Barfield*, 898 S.W.2d 288, 291 (Tex.1995). To waive the State's sovereign immunity, the Legislature must do so by clear and unambiguous language. *Id.; Duhart v. State*, 610 S.W.2d 740, 742 (Tex.1980). The same rule applies to the waiver of immunity for other governmental entities. *Barfield*, 898 S.W.2d at 291. The issue the Court must decide is whether the legislature has by clear and unambiguous language waived

---

**5.** For instance, UTMB argues that Lippert never invoked the grievance procedure before resigning and, the only time Hohman filed a grievance from a notice of intent to suspend, she received the relief she requested.

**6.** *See* TEX.REV.CIV. STAT. ANN. art. 4525a (Vernon Supp.1999).

immunity for claims of retaliation under the Nurse Reporting Act.

The Nurse Reporting Act provides in pertinent part:

No person shall suspend, terminate, or otherwise discipline or discriminate against a person reporting, without malice, under [the Act]. *A person has a cause of action against an* individual, organization, *agency,* facility, or other person *that suspends or terminates the employment* of the person or otherwise disciplines or discriminates against the person for reporting under [the Act].

TEX.REV.CIV. STAT. ANN. art. 4525a, § 11 (Vernon Supp.1999) (emphasis added).

The nurses argue that by using the word "agency" in the statute, the Legislature manifested its clear intent to waive the State's sovereign immunity. We disagree.

In one section of the Nurse Reporting Act, the statute specifically imposes a duty on "state agencies" to report nurses who fail to conform to the minimum standards of acceptable nursing practice. *See* TEX. REV.CIV. STAT. ANN. art. 4525a, § 4 (Vernon Supp.1999). Another section of the Act imposes duties on "each hospital, health science center, nursing home, *home health agency,* other health-care facility, *state agency,* political subdivision, school of professional nursing, temporary nursing service, or person that employs, hires, or contracts for the services of registered nurses" to report the identity of nurses it disciplines or fires for chemical dependency problems. *See* TEX.REV.CIV. STAT. ANN. art. 4525a, § 2(a), (b) (Vernon Supp.1999) (emphasis added). Thus, in at least two sections of the Nurse Reporting Act, the legislature was careful to clearly reference "*state* agencies." In fact, section 2 makes a distinction between "*state* agencies" and

"*home health* agencies." However, section 11, which creates a cause of action for nurses who suffer retaliation, uses the generic term "agency." "Agency" is not defined by the Act.

■ Language in a statute is presumed to be selected and used with care, and every word or phrase in a statute is presumed to be intentionally used with a meaning and purpose. *Chastain v. Koonce,* 700 S.W.2d 579, 582 (Tex.1985). Similarly, every word omitted from a statute must be presumed to have been excluded for a reason. *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540 (Tex. 1981). Therefore, we must presume that the legislature intentionally omitted the modifying term "state" from the term "agency" in section 11 of the Nurse Reporting Act. Thus, we find no clear intent to provide a cause of action against "state agencies" for retaliation claims under the Nurse Reporting Act.

**2. Conclusion**

■ The term "agency" is used ambiguously in section 11; it could refer to "state agencies," "home health agencies," or both. We hold that there is no clear and unambiguous waiver of sovereign immunity in section 11 of the Nurse Reporting Act.[7]

■ The trial court erred by denying UTMB's plea to the jurisdiction on Hohman's claims under the Nurse Reporting Act. Furthermore, to the extent that Shelver was acting in her official capacity, she enjoys the same governmental immunity as UTMB on Hohman's claims under the Nurse Reporting Act. *See Bagg v. University of Tex. Med. Branch at Galveston,* 726

---

7. For examples of clear and unambiguous waivers of sovereign immunity, see (1) the Texas Tort Claims Act, which states "[s]overeign immunity to suit is waived and abolished to the extent of liability created by this chapter." TEX. CIV. PRAC. & REM.CODE ANN. § 101.025(a) (Vernon 1997) and (2) the Whistleblower Act, which states "a public employ-

ee who alleges a violation of this chapter may sue the employing state or local governmental entity for the relief provided by this chapter. Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter." TEX. GOV'T CODE ANN. § 554.035 (Vernon Supp.1999).

S.W.2d 582, 586 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).

We sustain issues three and four.

## MOTIONS FOR SUMMARY JUDGMENT

The remaining issues concern the propriety of the trial court's denial of Dr. Mileski's and Nurse Shelver's motions for summary judgment, which are based on official immunity.

### A. Standard of Review

Summary judgment is proper when a movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); *Bangert v. Baylor College of Med.,* 881 S.W.2d 564, 566 (Tex.App.—Houston [1st Dist.] 1994, writ denied). In reviewing the summary judgment, we indulge every reasonable inference in favor of the non-movant and resolve any doubts in its favor. *Randall's Food Mkts., Inc.,* 891 S.W.2d at 644; *Bangert,* 881 S.W.2d at 565–66. Defendants are entitled to summary judgment if they conclusively establish all elements of an affirmative defense as a matter of law. *Roark v. Stallworth Oil & Gas, Inc.,* 813 S.W.2d 492, 495 (Tex. 1991); *Bangert,* 881 S.W.2d at 566.

### B. Sovereign Immunity for Claims against Mileski and Shelver in their Official Capacities

In issues six and seven, Mileski and Shelver contend that the trial court erred by denying their motions for summary judgment on the nurses' claims against Mileski and Shelver in their *official capacities* of (1) wrongful discharge, (2) defamation, (3) intentional infliction of emotional distress, (4) conspiracy, and (5) invasion of privacy.

A suit against government employees in their official capacities is, in all respects, a suit against the State; thus, employees sued in their official capacities are shielded by sovereign immunity. *See Whitehead,* 854 S.W.2d at 180; *Bagg,* 726 S.W.2d at 586. Thus, the issue we must decide is whether UTMB has sovereign immunity from these claims. If it does, such immunity also protects Mileski and Shelver in actions brought against them in their official capacities.

### 1. Intentional Torts

Defamation, conspiracy, intentional infliction of emotional distress, and invasion of privacy are intentional torts. *See Firestone Steel Prods. Co. v. Barajas,* 927 S.W.2d 608, 617 (Tex.1996) (civil conspiracy); *Twyman v. Twyman,* 855 S.W.2d 619, 621–22 (Tex.1993) (intentional infliction of emotional distress); *Billings v. Atkinson,* 489 S.W.2d 858, 860–61 (Tex.1973) (invasion of privacy); *City of Hempstead v. Kmiec,* 902 S.W.2d 118, 122 (Tex.App.—Houston [1st Dist.] 1995, no writ) (defamation).

The Texas Tort Claims Act provides that sovereign immunity exists for intentional torts. Tex. Civ. Prac. & Rem. Code Ann. § 101.057 (Vernon 1997). Therefore, UTMB, as a state agency, cannot be held liable for intentional torts of its employees. Similarly, Mileski and Shelver, in their official capacities, cannot be held liable for intentional torts.

### 2. Wrongful Discharge under *Sabine Pilot*

Under *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985), employees fired for refusing to perform an illegal act may sue their employers for wrongful discharge. However, the *Sabine Pilot* exception to the doctrine of employment at will does not supercede the State's right to assert sovereign immunity. *Carroll v. Black,* 938 S.W.2d 134, 135 (Tex. App.—Waco 1996, writ denied.) Because no *Sabine Pilot* cause of action can be asserted against the State, government officials sued in their official capacities are similarly protected. *See id.* at 134.

### 3. Conclusion

Because the State would be entitled to assert sovereign immunity to the nurses' claims of wrongful discharge, civil conspiracy, defamation, and intentional infliction of emotional distress, Mileski and Shelver, when sued in their official capacities, have the same immunity.

Accordingly, we sustain issues six and seven.

### C. Official Immunity for Claims against Mileski and Shelver in their Individual Capacities

In issues two, five, and eight, Mileski and Shelver contend that they are entitled to official immunity on the nurses' claims against them in their individual capacities. Specifically, in issues five and eight, Shelver contends that she is entitled to official immunity on (1) Hohman's claims against her under the Nurse Reporting Act and (2) Lippert's claims against her for invasion of privacy. In issue two, both Mileski and Shelver argue that they are entitled to official immunity on the nurses' claims for wrongful discharge, defamation, intentional infliction of emotional distress, and civil conspiracy.

■■■■ To show entitlement to official immunity, a defendant must show that his or her action was (1) a discretionary function, (2) performed in good faith, and (3) within the scope of his authority. *Kassen v. Hatley*, 887 S.W.2d 4, 8–9 (Tex.1994). Official immunity is an affirmative defense. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex.1994). We must determine whether Mileski and Shelver conclusively established each element of the defense, and, if so, whether the nurses produced evidence raising a fact issue on any element of the defense. *See Kassen*, 887 S.W.2d at 8.

■■■■ Because we conclude the issue of good faith is dispositive, we will address that element first. The test for good faith of a government official is whether, under the same or similar circumstances, reason-able government employees could have believed that their actions were lawful, based on the information they possessed at the time of the conduct. *Chambers*, 883 S.W.2d at 656; *Murillo v. Vasquez*, 949 S.W.2d 13, 16 (Tex.App.—San Antonio 1997, writ denied). If the defendants prove good faith as a matter of law, the burden of production shifts to the plaintiff to raise a fact question on the element. In order to controvert summary-judgment proof on the element of good faith, the plaintiffs must show that "no reasonable person in the defendant's position could have thought the facts were such that they justified [the] defendant's acts." *Chambers*, 883 S.W.2d at 657.

### 1. Mileski

■■■■ Mileski's affidavit provided the following evidence on the issue of official immunity:

7. I remember meeting Ms. Hohman at an ethics round table discussion in August 1996. I questioned her regarding some of the statements she made during the discussion, because based on her statements, it was my opinion that she appeared to have a conflict about performing some of the procedures required in the trauma setting. I did not impugn her skills as a nurse, because I had no knowledge of her skills and it is not my responsibility to evaluate nursing skills. *I never attempted "to get rid of her" or made any statements to that effect to any intern, resident, or anyone else.*

8. I did discuss with the Nurse Manager, Martha Shelver, what appeared to be Ms. Hohman's apparent conflict with her role in the crash room, as it was my goal to develop an efficient, skilled trauma team that would work well together to ensure that optimum quality of care was provided to every trauma patient.

9. *Until she filed this lawsuit, I did not know Lisa [Lippert]. I never made any verbal or written statement about her, defamatory or otherwise.*

10. Any comments I made regarding Ms. Hohman were based on my personal observations and reports received from other doctors and on my good faith belief that my statements were true.

11. *All actions taken in regard to Plaintiffs, if any, were taken within the course and scope of my employment, using my discretionary judgment, and in good faith.*

12. At all times, I conducted myself as a reasonably prudent Chief of Trauma Services and Co–Director of Emergency Medicine.

Mileski's evidence suggests the actions allegedly taken against the nurses were not in retaliation for their complaints, but were in fact based on his good faith belief that they had conflicts in performing procedures required of an emergency room nurse. Mileski denied knowing or speaking about Lippert and denied ever threatening to "get rid of the nurses."

In their response, the nurses submitted the following evidence:

1. Nurse Hohman's affidavit, which provided: "UTMB management persons and their subordinates persisted in making statements to other UTMB employees attacking me and other nurses who made the reports. When Mileski threatened the nurses that had caused him trouble in the Spring, 1997, and threatened to get their licenses, I knew that he was referring to Ms. [Lippert] and I. Ms. [Lippert] and I publicly revealed our concerns and made official reports to the appropriate agencies. I was frightened when I learned about Dr. Mileski's threats to get my license because I believe he is capable of such malicious actions."

2. Nurse Lippert's affidavit, which provided: "When Dr. Mileski told a UTMB nurse in the Spring, 1997, that he was going to "get those bitches" that had caused trouble for him and/or get their licenses, I knew he was talking about Ms. Hohman and myself. I had been quoted in the newspaper and had filed suit against Dr. Mileski by that time. I was very frightened when I heard about Dr. Mileski's threats against me because I knew that he could, and was capable of, causing even more severe damage to my career than had already occurred while I was employed there."

3. Nurse Sharon Atwell's deposition, in which she testified: "Dr. Mileski threatened the licenses of the nurses that were causing trouble for him as he put it. He said that he was going to have their licenses."

Mileski's statement that his actions were taken in good faith was a conclusory statement and may not be considered as summary judgment of good faith.[8] *Thomas v.*

---

8. Conceding that Mileski had limited, direct involvement with the nurses, they nonetheless alleged that he was responsible for the following acts of retaliation by his subordinates:
- verbal reprimands, admonishments, and threats
- derogatory comments attacking quality of their nursing care
- placed on notice of suspension
- given adverse performance review
- humiliated in front of peers by challenging their competence
- threatened with being "eliminated" by hospital official if continued reports were made
- singled out for monitoring of patients' charts
- unnecessary schedule changes
- false accusations of harming a patient
- written up and reprimanded for speaking out on patient violations
- nursing licenses placed in jeopardy
- transferred out of trauma to less challenging areas of work
- denied a grievance procedure
- designated as non-rehirable and denied pay by letter status
- performance review withheld
- denied possibility of promotion
- placed on "action plan" for alleged documentation deficiencies
- falsely accused in writing of improper conduct
- denied breaks during work hours

The acts of retaliation allegedly began in early 1996, shortly after Mileski assumed control of the emergency room and implemented new procedures, escalated in August 1996, after the nurses began reporting what they believed to be criminal and ethical violations of patients' rights, and culminated in the nurses'

*Collins,* 960 S.W.2d 106, 113 (Tex.App.—Houston [1st Dist.] 1997, pet. denied). However, Dr. Mileski's summary judgment proof indicates that a reasonable official in Mileski's place could have believed that the actions against the nurses were justified because they had a conflict with performing procedures required of ER nurses. Thus, Dr. Mileski carried his summary judgment burden to show good faith.

The burden then shifted to the nurses to show that no reasonable person in Dr. Mileski's position could have believed that the circumstances justified the actions taken against them. To meet this burden, the nurses introduced summary judgment evidence to show that Mileski's actions were taken in retaliation for "causing trouble for him" by reporting what they believed to be criminal and ethical violations in the emergency room at UTMB. This evidence presents a question of fact for a jury to resolve on the issue of Dr. Mileski's good faith.

### 2. Shelver

■ In support of her motion for summary judgment, Shelver presented the following evidence on the element of "good faith."

11. I [Shelver] did not learn that any reports about allegations of patients' rights violations had been made to agencies outside of UTMB until I read about it in the media in late November 1996, weeks after the Plaintiffs were no longer working at UTMB. I had no knowledge of the assault complaint filed the UTMB police department prior to the initiation of this lawsuit.

12. I had no knowledge that a report had been made to the board of Nurse Examiners until this lawsuit was filed.

13. All actions taken in regard to the Plaintiffs were done in good faith, using my best judgment as Nurse Manager responsible for supervising 90–100 nurses caring for emergency and trauma patients.

Shelver's evidence suggests that her actions could not have been in retaliation for reports filed by the nurses because she did not know about the reports until after the nurses quit.

The nurses filed the following evidence in response:

1. Hohman's affidavit, which provides: "I contacted the Texas Board of Nurse Examiners seeking information about the appropriate course of action. I also reported the incidents and pattern and practice of patient abuse and rights violations that I had observed to Ms. Kim Flores of the Board of Nurse Examiners. I told Shelver, Jackie Aoughsten (Shelver's assistant) in late August, 1996, and on separate occasions to Stephanie DeJohng (UTMB charge nurse), Lisa [Lippert], Sharon Atwell, Hollie Walker and other UTMB Emergency Room nurses that I had contacted and made a report to the Texas Board of Nurse Examiners. After I told Ms. Shelver about the report, I was retaliated against, including being placed on notice of suspension, changed work schedules, harassment, chart audits, monitoring and verbal harassment."

2. Lippert's affidavit, which provided: "I was subjected to retaliatory actions following my reports of patient abuse to UTMB Nursing Administration and the Texas Department of Health in August, 1996, all of which became so intolerable that I was forced to resign. I told Stephanie DeJohng, UTMB charge nurse, about the anonymous report to the Texas Department of Health shortly after I made the report in August, 1996. After I told Ms. DeJohng about my report to the Texas Dept. of Health in August, 1996, I was subjected to the following unwarranted and retaliatory actions,

resignations in November 1996. The nurses allege that the retaliation continued even after their 1996 resignations when, in the spring 1997, Mileski threatened to "get their licenses."

verbal reprimands, admonishments, and threats by Martha Shelver . . . ."

3. Lippert's affidavit also provided: "The fact that Stephanie Hohman had made a report to the Texas Board of Nurse Examiners was a matter of common knowledge in the Emergency Department. I was aware of it and Ms. Hohman and I did not even work on the same shift."

In contrast to Shelver's affidavit, the nurses' evidence suggests that Shelver did, in fact, know about the reports before the alleged acts of retaliation occurred. Accordingly, we hold that there is a fact question on the issue of Shelver's good faith.

■ Shelver also contends that Hohman's claim against her individually under the Nurse Reporting Act must fail because Hohman did not state a claim under the Act. Specifically, Shelver argues that Hohman never filed a written report, but only made an oral report to the board of nursing examiners.

However, in *Clark v. Texas Home Health, Inc.,* 971 S.W.2d 435, 437 (Tex. 1998), the court held that a written report was not a prerequisite to receiving protection against retaliation under section 11 of the Nurse Reporting Act. Thus, Hohman did state a claim under the Nurse Reporting Act. Because we have already held that there was a question of fact regarding Shelver's good faith on this claim, summary judgment was not appropriate.

We overrule issues two, five, and eight.

## CONCLUSION

Because we have held that the nurses properly pled a cause of action under the Whistleblower Act, and that the Act waives sovereign immunity from suit, we affirm the trial court's ruling denying the UTMB's plea to the jurisdiction on those claims. In light of our holding that the Nurse Reporting Act does not contain a waiver of sovereign immunity from suit, we dismiss those claims as they relate to UTMB or Shelver when sued in her official capacity. Because no cause of action for intentional torts will lie against the State, we dismiss those claims as they relate to Mileski and Shelver in their official capacities. Finally, we reverse and remand all claims against Mileski and Shelver in their individual capacities because there is a question of fact on the element of good faith.