# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===================================

## ON SECOND MOTION FOR REHEARING

===================================

## NO. 03-03-00582-CV

**Britton Cherish Walters, Appellant**

**v.**

**Columbia/St. David's Healthcare System, L.P.; Hospital Internists of Austin, P.A.; Steven Todd Cole, D.O.; and Louis J. Lux, M.D., Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. GN303043, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Our opinion and judgment issued on April 14, 2005 are withdrawn, and the following opinion is substituted.

Appellant Britton Cherish Walters brought suit against St. David's Healthcare System, L.P., Dr. Steven Todd Cole, Dr. Louis J. Lux, and the Hospital Internists of Austin, P.A.[1] Walters, a registered nurse, alleged a violation of the anti-retaliation statute[2] against St. David's,

---

[1] Because Cole and Lux belong to the Hospital Internists of Austin practice group and the same claims are asserted against the doctors individually as against the group, these three appellees will be referred to, collectively, as "HIA," except where the doctors are referred to individually.

[2] *See* Tex. Health & Safety Code Ann. § 161.134(a) (West 2001).

defamation and intentional infliction of emotional distress against St. David's and HIA, and tortious interference with a contract against HIA. Both St. David's and HIA moved for summary judgment. The district court granted summary judgment in favor of St. David's and HIA. Walters appeals, urging in seven issues that the summary judgment should be reversed on the grounds that she produced sufficient evidence to support each of her claims against St. David's and HIA, and that the appellees did not conclusively establish any affirmative defenses. Finding that St. David's and HIA demonstrated their entitlement to summary judgment as a matter of law, and that Walters failed to raise a fact issue on a material matter, we affirm the summary judgment.

## BACKGROUND

Walters began working as a nurse at the South Austin Hospital location of St. David's on February 6, 2001. The majority of the patients at South Austin were considered "HIA patients" because their treatment was assigned to physicians belonging to the HIA practice group, which included Drs. Cole and Lux. Other physicians, who were not members of the HIA practice group and were not assigned to treat HIA patients, also worked at South Austin.

Walters and Cole became romantically involved a few months after she started working at the hospital. They dated from May to August 2001. According to Walters, their relationship ended on bad terms. Shortly after terminating her relationship with Cole, Walters began dating Daniel DiBona, a non-HIA physician who also worked at the hospital. After dating for approximately one month, Walters and DiBona moved in together and were residing together at the time this suit was brought.

2

On the evening of January 3, 2002, Walters was assigned to care for an HIA patient who had undergone a heart catheterization earlier that day. Cole was assigned as the "on call" physician for the patient. Based on the patient's symptoms, Walters became concerned that the patient was suffering a stroke. Walters called Cole around 9:30 p.m. and expressed her concerns. Cole decided not to come into the hospital, but he ordered that a CT scan be performed and that certain medications, including Narcan and Lovenox, be administered to the patient. Cole also instructed Walters to monitor the patient's vital signs and blood pressure. Walters complied with Cole's instructions, and a radiologist performed the CT scan. The radiologist reported back to Cole that the results of the scan were inconclusive because they showed "no acute abnormality," which only ruled out the possibility of a hemorrhage.

Walters disagreed with Cole's decision to not come to the hospital. Although Walters testified at her deposition that she had no trouble contacting Cole, she testified that he behaved "drunk" and "belligerent" on the telephone. Walters therefore sought guidance from DiBona, who was not assigned as a treating physician for this patient and was not a member of the HIA practice group.

Walters testified that she called DiBona and posed a "medical scenario" to him by describing the patient's age and symptoms without revealing the patient's name. Walters testified that she told DiBona, "I have a patient that came back from a heart catheterization only a few hours later. She's nonresponsive to pain on one side. She's nonverbal. Her family says it's different. Does this seem like a stroke to you?" Walters testified that DiBona confirmed her suspicions by responding that, "[y]es, this is a stroke that she is presenting with, more than likely." Walters acknowledged that her conversation with DiBona pertained to the possible medical treatment options

3

that were available for the patient. When asked during her deposition whether she and DiBona discussed what medications would be appropriate for this patient, Walters testified that DiBona "mentioned two possibilities . . . two different types of blood thinners. . . . They were Heparin and Lovenox." Walters also acknowledged that, when she called DiBona, she knew he was not assigned as a treating physician for the patient.

At approximately 11:30 p.m., after talking to DiBona, Walters called the patient's treating cardiologist, Dr. Erol Ozdil. Walters testified that she told Ozdil she had run the medical scenario by another doctor who agreed the patient's symptoms sounded like a stroke. Walters also testified that she asked Ozdil whether Heparin or Lovenox would be the more appropriate medicine for this patient. Ozdil agreed to come to the hospital and evaluate the patient. It was later confirmed that the patient had suffered a stroke.

Cole testified that, at some point the next day, January 4, Ozdil reported back to him about the patient's condition and told him that Walters had conferred with another physician about the patient's treatment. This information prompted Cole to review Walters's nursing notes on the patient. He discovered that Walters had included a comment in her notes about Cole's decision to not come to the hospital on the night of January 3. Cole discussed the situation with his supervisor, Dr. Lux. Cole and Lux then went to see Carole McGhee, the Director of Nursing at St. David's South Austin Hospital. The doctors testified that their purpose for meeting with McGhee was to express their concerns about Walters revealing confidential patient information to a non-treating, non-HIA physician. Because they considered Walters's conduct to have violated the hospital's confidentiality policy, Cole and Lux requested that Walters be permanently restricted from treating

4

HIA patients. McGhee expressed that she "could not accommodate that request on a permanent basis given scheduling considerations," but she agreed to temporarily restrict Walters from treating HIA patients pending an investigation.

As McGhee stated in her affidavit, following her meeting with Cole and Lux, McGhee discussed the situation with South Austin's Chief Nursing Officer and with the Director of Nursing Practice, who was responsible for the peer review program. McGhee then decided that "Walters should receive a written counseling and that her conduct should be referred to the Hospital's Peer Review Committee for a formal determination regarding the patient's confidentiality issue."

Walters testified that McGhee called her on January 4 and told her that she "definitely need[ed] to come in" for a meeting. Walters testified that she told McGhee during their telephone conversation that Cole "was a drunk and that [] was why he didn't come in to see patients."[3] Later that day, McGhee met with Walters and explained that Cole and Lux had reported that Walters breached the confidentiality policy by discussing an HIA patient's treatment with a non-treating physician. Walters admitted that, on the night of January 3, she called DiBona and described the patient's symptoms, and that DiBona said the patient was most likely having a stroke. McGhee prepared a peer review investigation form, titled "South Austin Medical Center Counseling Statement," on which she noted that Walters "spoke with a physician who was not on a patient's case regarding possible medical treatment options for that patient. (She did not specifically identify the

---

[3] Walters claims that she also made reports about Cole abusing controlled substances in the fall of 2001, to Dennis Tweety of the Texas Medical Association, and on January 11, to hospital administrator Mark Bethel.

5

patient by name or age[4]).” Walters agreed that McGhee’s notation was an “accurate summary” of her statement.

Given the doctors’ report and Walters’s admissions, McGhee concluded that Walters “reveal[ed] information regarding the patient and the patient’s medical condition which would have rendered it easy for Dr. DiBona to determine the patient’s identity given his frequent presence at the hospital.” McGhee believed that Walters’s actions possibly violated the hospital’s confidentiality policy, which Walters signed when she started working for St. David’s. The policy states, in relevant part:

> I understand that I may not discuss confidential patient information except to the extent that performance of my job requires it. Otherwise, I will not read, discuss, or release any information contained within the medical record of any patient without proper authorization from the patient or the patient’s legal representative. I will release information contained within patient medical records only with proper authorization by South Austin Hospital. . . . In the event that I breach any of the above statements, I understand I will be subject to immediate dismissal. . . .

Walters also signed a confidentiality agreement stating that,

> [a]s a condition of employment, I agree to not divulge to any unauthorized persons, any confidential information obtained from observations, correspondence, personal records, clinical materials, and/or any other sources. . . . I understand that any violation of this confidentiality agreement is very serious and warrants disciplinary action.

---

[4] At her deposition, Walters testified that the scenario she presented to DiBona was “something like, ‘60-year old female had a heart catheterization. . . .’” Walters also testified that she understood a patient’s age to be confidential information.

McGhee noted on the counseling statement that, "[b]ecause of [Walters's] possible breach of confidentiality, I am referring this situation to Nursing Peer Review for evaluation and recommendation." McGhee informed Walters of this decision and gave her the counseling statement, which afforded Walters the opportunity to submit any additional written comments. McGhee instructed Walters to fill out, sign, and return the form. Walters testified that she never complied, despite the fact that McGhee reminded her on three subsequent occasions.

McGhee also explained during their January 4 meeting that, for a temporary period, Walters would not be assigned to HIA patients. Although Walters's assignments were more limited after January 4, Walters testified that she was in fact assigned to care for HIA patients from January 5 until her last day of work on February 6; that she never saw a formal, written order restricting her from HIA patients; and that she never received further instruction from McGhee to not care for HIA patients.

On January 15, Walters called McGhee and told her that she was going to quit because she "was feeling pressure to the point where [she] couldn't concentrate on patient care." Walters also told McGhee that "I knew this wasn't her fault" because "she was also under stress." In response, McGhee explained that Walters would not be able to collect her accrued vacation pay unless she worked at least one full year. Accordingly, Walters submitted a written letter to McGhee on January 18, stating that her resignation would be effective February 6, 2002, exactly one year from the date Walters began working at the hospital. During the last three weeks of Walters's employment, she missed at least seven shifts, calling in sick on some days and claiming to have been "stuck" out of town on the other days. Walters quit work on February 6, before the peer review

7

process was completed. Walters testified that the correct sequence of events was that she announced her resignation and then found out that "*because* [she was] leaving, peer review had been dropped;" it was "not the other way around." (Emphasis added.)

Walters thereafter sued St. David's, as well as Cole, Lux, and the HIA practice group, asserting claims for defamation, retaliation, intentional infliction of emotional distress, and tortious interference with a contract. St. David's and HIA moved for summary judgment on each of Walters's claims, asserting both traditional and no-evidence grounds for summary judgment, and attaching supporting evidence. *See* Tex. R. Civ. P. 166a(c); 166a(i). The district court granted summary judgment in favor of St. David's and HIA without specifying a ground for its order. Walters appeals the summary judgment, claiming that she satisfied her burden as the nonmovant by producing more than a scintilla of evidence to create a fact issue on at least one element of each claim.

**STANDARD OF REVIEW**

We review the district court's grant of summary judgment *de novo*. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). When a movant presents both traditional and no-evidence grounds for summary judgment, and the district court does not specify the ground upon which the motion is granted, as here,[5] we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life &*

---

[5] Walters disputes whether the appellees sufficiently presented both grounds for summary judgment. Parties are permitted to combine motions for summary judgment under subsections (a-c) and subsection (i) of Rule 166a, and the no-evidence motion shall not be disregarded simply because the movant attached evidence in support of its motion. *See Binur v. Jacobo*, 135 S.W.3d 646, 650-51 (Tex. 2004).

*Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 217 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex. 1985).

A defendant who moves for summary judgment under Rule 166a(c) is entitled to have its motion granted if it conclusively negates at least one of the essential elements of the plaintiff's cause of action or if it conclusively proves each element of its affirmative defense, thereby showing that it, as the movant, is entitled to judgment as a matter of law because no genuine issues of material fact remain. *Rhone-Poulenc*, *Inc. v. Steel*, 997 S.W.2d 217, 222-23 (Tex. 1999). The defendant must support its motion with proper summary judgment evidence. Tex. R. Civ. P. 166a(c). Only if the defendant meets its burden does the burden shift to the plaintiff, as the nonmovant, to establish that a genuine issue of material fact remains. *Id*.

The defendant's burden in moving for summary judgment under Rule 166a(i) is less strenuous. The defendant must establish that "after adequate time for discovery . . . there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." *Id*. 166a(i); *Fort Worth Osteopathic Hosp.*, *Inc. v. Reese*, 148 S.W.3d 94, 98 (Tex. 2004). The burden then shifts to the plaintiff, in its attempt to defeat the summary judgment motion, to produce sufficient evidence to raise a genuine issue of material fact supporting the disputed issue. *Forbes Inc. v. Granada Biosciences*, *Inc*., 124 S.W.3d 167, 172 (Tex. 2003). The plaintiff must produce more than a scintilla of probative evidence, meaning that it must not be "so weak as to do no more than create a mere surmise or suspicion of a fact." *King Ranch v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

9

## ANALYSIS

To support each of her four causes of action—retaliation, defamation, intentional infliction of emotional distress, and tortious interference with a contract—Walters relies on essentially the same allegations. Walters claims that, after reporting that Cole abused controlled substances and acted negligently, she suffered adverse employment actions at the hospital, such as being restricted from HIA patients and being the subject of rumors. She claims to have felt "threatened" and "unsupported" by hospital managers who supported the peer review process, but she also claims that it was "malicious" for the hospital to have failed to complete her peer review after she resigned. Walters asserts that her workplace conditions became so stressful that she was constructively discharged. She blames this series of events on the doctors, for "falsely" reporting to McGhee that Walters violated the confidentiality policy, and on the hospital for "ratifying" the doctors' report. Walters asserts that these actions amounted to "extreme and outrageous" conduct by the hospital and the doctors.

Both St. David's and HIA assert that there is a lack of evidence to support at least one element of each cause of action, and both raise affirmative defenses. Although we will address each of Walters's causes of action independently, we first turn to the appellees' assertion that Walters's entire case fails because the report made by Cole and Lux to McGhee was true.

### *Violation of Confidentiality Policy*

The specific statement by Cole and Lux, which Walters claims to be false, is that "Walters did not follow hospital protocol and repeatedly shared confidential patient information with

a non-treating physician."  If it was true[6] that Walters repeatedly violated the hospital's confidentiality policy, then it was not defamatory for the doctors to have reported this to McGhee, nor improper for the hospital to have disciplined Walters based on it.  It follows that St. David's actions of referring Walters to peer review and restricting her treatment of HIA patients would be justified as legitimate business decisions and protected by the qualified immunity attached to peer review actions.  Further, the making of or acting upon a true report could not be considered "malicious," "extreme and outrageous," or "tortious."  Thus, if the doctors' report is true, then Walters cannot create a genuine issue of material fact on any element of her claims for retaliation, defamation, intentional infliction of emotional distress, or tortious interference with a contract.

Walters's own testimony establishes that she "did not follow hospital protocol and repeatedly shared confidential patient information with a non-treating physician."  Walters

---

[6] HIA asserts that, although the evidence shows their report to be true, it is only necessary to prove the statements were "substantially true."  HIA cites *Rodgers v. Dallas Morning News*, *Inc.*, for this proposition.  889 S.W.2d 467, 472 (Tex. App.—Dallas 1994, writ denied) (citing *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990)).  Walters does not challenge HIA's assertion.  We note, however, that the Texas Supreme Court has only applied the "substantial truth" defense in the context of media defendants.  *See*, *e.g.*, *Turner v. KTRK Tel.*, *Inc.*, 38 S.W.3d 103, 115 (Tex. 2000); *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000); *Cain v. Hearst Corp.*, 878 S.W.2d 577, 588 n.6 (Tex. 1994) (Hightower, J., dissenting); *McIlvain*, 794 S.W.2d at 16.  The basis of the defense is that, in order to protect a media defendant's constitutional right to free speech, an article or broadcast will not be considered defamatory, even if some details are inaccurate, so long as the "gist" of the report is substantially true.  *Turner*, 38 S.W.3d at 115.  Several of our sister courts have applied the substantial truth defense to private defendants without discussing the distinction between types of defendants.  *See*, *e.g.*, *Cram Roofing Co. v. Parker*, 131 S.W.3d 84, 90 (Tex. App.—San Antonio 2003, no pet.); *Austin v. Inet Techs.*, *Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.); *Larson v. Family Violence & Sexual Assault Prevention Ctr.*, 64 S.W.3d 506, 515 (Tex. App.—Corpus Christi 2001, pet. denied).  We need not resolve this issue because the record in this case—primarily Walters's deposition testimony—supports the actual truth of appellees' report.

11

characterized DiBona as a "human reference book" who was "very accessible" to her. She explained that, if she was working at the hospital and a medical situation arose for which she did not know the answer, she would frequently call DiBona and ask him about "real life scenarios that [she] was facing at the hospital . . . even though the scenarios dealt with patients who were not his patients." Walters testified that she did this approximately once a week for at least six months. Walters agrees that she posed such a medical scenario to DiBona on the night of January 3, when she called him to inquire about the "possible medical treatment options" for the heart catheterization patient. However, Walters asserts that she never revealed the name of a patient about whom she was inquiring. Walters also testified that she downloaded, printed, and took home documentation from patients' medical records without permission. She acknowledged doing this "typically . . . at the end of each work day."

Walters urges that her frequent discussions with DiBona did not violate the confidentiality policy because she did not disclose the patients' names. Walters additionally urges that her actions on January 3 were not in violation of the policy, due to the policy's exception allowing nurses to reveal confidential information "to the extent that performance of [their] job requires it." Based on Cole's decision to not come into the hospital that night, Walters claims it was necessary for her to call DiBona, a non-treating physician, and discuss the treatment options for the heart catheterization patient. Additionally, Walters claims she did not violate the policy by taking home documentation of patients' medical records because she was only interested in the portions containing her own notes.

12

The hospital's confidentiality policy, which Walters signed upon accepting employment at St. David's, expressly prohibits revealing "any information contained within the medical record of any patient without proper authorization." It is undisputed that Walters discussed the treatment of a patient with a non-treating physician, including such details as the patient's diagnosis and appropriate medications. Nothing in the confidentiality policy or the confidentiality agreement allows disclosure if the patient's name is omitted. Walters also acknowledged that she removed medical records from the hospital without authorization. Walters provides no authority to show that the hospital permitted its staff to remove a patient's medical records for any purpose.

In Texas, a patient's medical information is generally considered to be "confidential," and is therefore broadly protected, with only a few, narrowly defined exceptions. The Texas Occupations Code states that any "record of the identity, diagnosis, evaluation, or treatment of a patient by a physician that is created or maintained by a physician is confidential." Tex. Occ. Code Ann. § 159.002(b) (West 2004); *see also id.* § 159.004 (West 2004) (listing specific exceptions to confidentiality, not including "omission of patient's name" or "for one's own interest"). Similarly, the Texas Health and Safety Code protects a patient's "health care information," which is defined as "information recorded in any form or medium that identifies a patient and relates to the history, diagnosis, treatment, or prognosis of a patient." Tex. Health & Safety Code Ann. § 241.151(2) (West 2001). Further, the Corpus Christi court has held that health care information does not lose its confidential status simply because a patient's identifying information is redacted. *In re Columbia Valley Reg'l Med. Cent.*, 41 S.W.3d 797, 800 (Tex. App.—Corpus Christi 2001, no pet.)

13

(confidentiality not limited to cover only identity of patient). Thus, the information Walters revealed to DiBona was confidential, even without the patient's name.

Moreover, Walters's actions on the night of January 3 do not fall within the policy's exception for revealing confidential information "to the extent that performance of [a nurse's] job requires it." Walters does not dispute that, if a medical problem arises, the nurse should first contact the patient's treating physician. Walters complied with this by calling Cole, who gave treatment orders for the patient. Walters also does not dispute that, if additional help is needed, other treating physicians are available and should be contacted. Walters also complied with this by contacting Ozdil, the patient's treating cardiologist, who came to the hospital and treated the patient.

Although Walters was aware of other treating physicians who were available to assist her and she understood that hospital protocol only permits a patient's healthcare information to be revealed to authorized persons, she claims that, for the welfare of the patient, she was "required" to discuss the patient's medical diagnosis with DiBona, in order to confirm whether she should contact another physician. This claim finds no merit in the record. Walters presented no evidence of anything that prevented her from contacting Ozdil or other authorized person upon finding out that Cole would not come in, and she presented no evidence to demonstrate why, in the midst of these events, she was "required" to solicit the advice of a third party prior to contacting the alternate, treating physician. Because the record evidences nothing that prevented Walters from following hospital policy by contacting a treating physician, there is no evidence that the "performance of her job" required her to discuss the patient's treatment with DiBona. The doctors and the hospital, therefore, conclusively established that Walters's conduct violated the confidentiality policy, while

14

Walters failed to put forth even a scintilla of evidence to raise a genuine issue of material fact as to whether her conduct came within the policy's exception.

Thus, even when viewed in a light most favorable to Walters, the evidence establishes that the report by Cole and Lux—"that Walters did not follow hospital protocol and repeatedly shared confidential patient information with a non-treating physician"—was true. Walters failed to present a scintilla of evidence to create a genuine issue of material fact about the veracity of their report. If anything, her testimony supported the appellees' affirmative defense of truth. The truth of their report supports an affirmance of the summary judgment on each of Walters's claims, either by establishing an affirmative defense or negating the existence of a fact issue. We will, nevertheless, discuss each of her claims.

### *Defamation*

Walters claims in her fourth and fifth issues that HIA, Cole, and Lux defamed her by falsely stating that she violated the hospital's confidentiality policy, and that St. David's ratified these defamatory statements by limiting Walters's assignments to HIA patients and by allowing the doctors to mistreat her at work. To recover for defamation, a private plaintiff must prove that the defendant (1) published a statement, (2) that was defamatory to the plaintiff, (3) while acting negligently as to the truth of the statement. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). A statement is defamatory if it tends to injure one's reputation, exposing her to public hatred, contempt, and ridicule. Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 1997). In defamation suits brought by private individuals, truth is an absolute defense, upon which the

15

defendant has the burden of proof. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 & n.6 (Tex. 1995).

We hold that the appellees satisfied their burden of conclusively establishing the truth of the allegedly defamatory statements. *See id.* at 644. Walters's fourth and fifth issues are overruled.

### Retaliation

In her second issue, Walters claims that St. David's retaliated against her in response to four reports she allegedly made about Cole's substance abuse and/or his negligent care of a patient. The health and safety code states that

> [a] hospital . . . may not suspend or terminate the employment of or discipline or otherwise discriminate against an employee for reporting to the employee's supervisor, an administrator of the facility, a state regulatory agency, or a law enforcement agency a violation of law, including a violation of this chapter, a rule adopted under this chapter, or a rule adopted by . . . the Texas Commission on Alcohol and Drug Abuse.

Tex. Health & Safety Code Ann. § 161.134(a) (West 2001). Walters asserts that she is entitled to a rebuttable presumption of retaliation because she suffered adverse employment actions within sixty days of making a report. *See id.* § 161.134(f) (West 2001).

St. David's contends that there is no evidence to support a causal link between any report allegedly made by Walters and any adverse employment action taken by the hospital. The hospital also urges that Walters is not entitled to a presumption of retaliation because the hospital did not take any adverse actions against her and because, even if the presumption applied, it is

16

overcome by evidence that Walters violated the hospital's confidentiality policy, which gave St. David's a legitimate business reason for any employment decisions it made. *See Thomas v. Clayton Williams Energy*, *Inc.*, 2 S.W.3d 734, 739 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (proof of legitimate reason rebuts presumption of retaliation).

The four reports that Walters claims to have made about Cole's substance abuse and/or his negligent care of a patient were: (1) to Dennis Tweety of the Physician's Health and Rehabilitation division of the Texas Medical Association in fall 2001, (2) in her nursing notes on the night of January 3, (3) to McGhee during their January 4 telephone conversation, and (4) to hospital administrator Mark Bethel on January 11. Walters asserts that, because of these reports, St. David's retaliated against her by restricting her from HIA patients, referring her to peer review, not completing the peer review following her resignation, allowing her to become the subject of "rumor mongering," failing to prevent Cole from physically confronting her at work, and generally making her work conditions so intolerable that she was constructively discharged.

Walters's own testimony shows the absence of a causal link because it establishes that St. David's did not have knowledge of any actionable report prior to making any employment decision about Walters. First, Walters's report to Tweety at the TMA was a verbal report, and she testified that she never told anyone at the hospital about it. She adduced no evidence that anyone at the hospital had knowledge of the report. Second, Walters's nursing notes do not come within the scope of the statute's definition. *See* Tex. Health & Safety Code Ann. § 161.134(a). The notes simply state that "I asked Dr. Cole to come assess [patient]. Dr. Cole stated that he was not coming to assess [patient], but wanted Narcan to be given . . . [and] have CT of head, with results called to

17

him." This does not constitute a report "to the employee's supervisor, an administrator of the facility, a state regulatory agency, or a law enforcement agency" about any violation of law or adopted rule. *See id.* Third, Walters's statement to McGhee during their January 4 telephone conversation does not support her retaliation claim because the evidence shows that, by this time, the HIA doctors had already reported Walters's violation, and McGhee had already decided to refer Walters to peer review; McGhee summoned Walters to her office during this conversation. Similarly, Walters's January 11 report to administrator Bethel occurred after the hospital took the actions about which Walters complains, and therefore does not support her claim for retaliation.

There is no evidence that the hospital or the doctors were otherwise aware of any reports made by Walters. She confirmed that she never provided anyone at the hospital with a written report about Cole's alleged substance abuse and/or his negligent treatment of patients. She testified that the only written complaint she lodged against Cole was to the State Board of Medical Examiners on February 11, 2002. Because this report was made after Walters's resignation from the hospital and, hence, was subsequent to any adverse action taken against Walters, it provides no evidence of a causal link between a report and a retaliatory action.

Any adverse actions that St. David's took against Walters were not retaliatory because they were justified, as legitimate business decisions, by Walters's violation of the confidentiality policy. *See Thomas*, 2 S.W.3d at 739. When an employer has knowledge that an employee violated workplace policies, the employer is entitled to investigate the allegations and take appropriate disciplinary actions. *See Johnson v. Merrill Dow Pharm.*, *Inc.*, 965 F.2d 31, 34 (5th Cir. 1992). As set forth above, Walters's testimony confirmed the truth of the doctors' report that she had violated

18

hospital protocol by discussing a patient's treatment with a non-treating physician. Thus, St. David's was justified in temporarily limiting Walters's assignments to HIA patients and in referring her to the nursing peer review process.

There is also no evidence in the record to support the other "retaliatory" actions Walters claims to have suffered. Walters's own actions caused the peer review to not be completed; she testified that she never returned the counseling statement as requested by McGhee and that she was absent several times during her last few weeks of work, when the peer review process was ongoing. Walters further testified that she understood the reason the peer review process ended was because she resigned. Walters provides no legal authority to support her claim that the hospital is obligated to complete peer review after an employee quits. Conversely, St. David's points to the peer review policy, which states that the procedure applies to "current employees." Thus, Walters was not retaliated against when, following her resignation, the hospital did not conclude her peer review.

Walters claims that the hospital allowed her to become the subject of "rumor mongering" for a period of weeks. Walters testified that she heard "hushed whispers talked about me when I walked into a room" and that she "believed" another nurse told co-workers that Walters had engaged in sexual activity with Cole and DiBona on the hospital's premises. But Walters testified that this rumor could not be attributed to any of the appellees, and no other witness testified to the existence of rumors. Walters also claims that Cole and Lux spread rumors about her by requesting that she not be assigned to care for HIA patients. Because the doctors and the hospital were justified in restricting Walters from HIA patients pending the investigation, this claim does not

19

evidence a violation of section 161.134(a). The record does not support Walters's claim that "rumor mongering" occurred, or if it did, that it was actionable, retaliatory conduct.

Walters claims that one night at the hospital, following the January 3 incident, Cole confronted her, pinned her against the wall, "puffed up, got bigger, and moved closer," and then said "he didn't have a problem with me taking care of HIA patients, [but] his bosses did." Cole testified that he told Walters his bosses did not want her assigned to HIA patients, but claims he was sitting behind the nurses' station when she approached him in a "heightened emotional state," asking if he "had a problem with her nursing skills." Cole stated that the encounter was "tense" and "brief."[7] Taking Walters's account of the confrontation as true, it does not support her retaliation claim because she testified that she never reported this incident to anyone at St. David's or HIA, and that she was not aware of anyone who witnessed the event. Cole also testified that he did not recall anyone else being present at the time. Without notice that the alleged confrontation occurred, St. David's could not have retaliated against Walters by failing to act on it.

Regarding her claim of intolerable work conditions, Walters testified that McGhee reprimanded her, along with other nurses, for wearing scrubs from different hospitals and for chewing tobacco at work. Also, Walters testified that she felt unsupported at work because other nurses left positive notes for each other on a break-room message board, and she did not remember having any posted about her. She cites no authority to support her claim that these actions were "retaliatory."

---

[7] Cole acknowledged in his deposition that, over a five-year period, there had been two complaints made against him based on his interactions with nurses and that McGhee had counseled him to "state [his] grievances in a way that was not upsetting to nurses."

Relying on *University of Texas Medical Branch v. Hohman*, Walters urges that such proof is sufficient to survive summary judgment on her retaliation claim. 6 S.W.3d 767, 780 (Tex. App.—Houston [1st Dist.] 1999, writ dism'd w.o.j.). The nurses in *Hohman* asserted that their former employer retaliated against them in numerous ways, including reprimanding, threatening, suspending, and humiliating them. *Id*. at 780 n.8. The *Hohman* court reversed and remanded the summary judgment, based on its finding that a fact issue remained on the employer's "official immunity" defense, without reaching the sufficiency of the nurses' evidence. *Id*. at 780. Thus, *Hohman* does not support Walters's claim that she has adduced sufficient evidence of "intolerable conditions" to survive summary judgment on her retaliation claim. Walters's proof does not amount to more than mere surmise or suspicion and is, therefore, insufficient to raise a genuine issue of material fact. *King Ranch*, 118 S.W.3d at 751.

Because Walters failed to establish a causal link between any report she made and any adverse employment action the hospital took, and because the hospital satisfied its burden of rebutting any presumption of retaliation with proof of a legitimate reason for its actions, Walters's second issue is overruled.

### *Intentional Infliction of Emotional Distress*

Walters claims in her third and sixth issues that she suffered intentional infliction of emotional distress based on the doctors' report that she violated hospital protocol, St. David's decision to limit her care of HIA patients, St. David's allowance of rumor mongering, and the physical confrontation she allegedly had with Cole. To recover damages for intentional infliction of emotional distress, a plaintiff must establish that: (1) the defendant acted intentionally or

21

recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Hoffman-La Roche*, *Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004).

St. David's and HIA challenge that Walters failed to produce a scintilla of evidence that they acted in an extreme and outrageous manner. Conduct should not be labeled as "extreme and outrageous" unless it goes beyond all possible bounds of decency, such that it is "atrocious and utterly intolerable in a civilized community." *Id*. Ordinary employment decisions may be unfair or unpleasant, but they do not rise to the level of being extreme and outrageous, especially in an at-will employment context. *See id.* at 449. Thus, it is "only in the most unusual of circumstances," if a plaintiff can show some conduct outside the realm of ordinary employment actions, that a claim for intentional infliction of emotional distress will lie against an employer. *GTE Southwest*, *Inc. v. Bruce*, 998 S.W.2d 605, 612-13 (Tex. 1999).

We have already addressed that the doctors' report regarding Walters's violation of the confidentiality policy was true, and that St. David's was justified, based on this report, in referring Walters to peer review and limiting her treatment of HIA patients pending an investigation. Also, Walters testified that the restriction was only temporary, and that she in fact cared for HIA patients between January 5 and her resignation on February 6. Thus, these employment actions by St. David's and HIA do not constitute extreme and outrageous conduct.

We have similarly addressed the record's lack of support for Walters's claim that she became the subject of rumors at the hospital. Because Walters failed to produce a scintilla of evidence to show that such rumors occurred or that they were attributable to appellees, these claims

22

provide no evidence of conduct by the appellees that was "beyond all possible bounds of decency, atrocious and utterly intolerable in a civilized community." *See Zeltwanger*, 144 S.W.3d at 445.

Assuming Cole physically confronted Walters as she testified, this evidence, while disturbing, does not rise to the level of extreme and outrageous conduct by either HIA or the hospital. Walters cites *American Medical International*, *Inc. v. Guirintano* as supporting authority, but that case is distinguishable from the instant one. 821 S.W.2d 331 (Tex. App.—Houston [14th Dist.] 1991, no writ). In *Guirintano*, a hospital administrator claimed that a group of doctors intentionally inflicted emotional distress upon him by verbally and physically attacking him at a cocktail party; he claimed that the doctors jumped all over him, raised their voices, expressed anger, cursed, directed racist comments at him, threatened him, and ultimately blamed this confrontation on the administrator, using it as a basis to have him fired. *Id*. at 341-42.

The conduct alleged in *Guirintano* was more severe and prolonged than the isolated incident alleged by Walters. Even still, the court found that the cocktail-party incident alone was insufficient to prove extreme and outrageous behavior. *Id*. at. 342. Rather, the court held that the proof was sufficient based on cumulative evidence that the doctors engaged in a "conspiracy . . . to intentionally put Giurintano in confrontational situations and use his responses to these confrontations for the purpose of opposing his appointment." *Id*. Walters produced no such evidence. Additionally, the standard of review in *Guirintano* was different from this case. There, the court was bound to affirm a jury's finding of intentional infliction of emotional distress unless the doctors proved that no reasonable person could have made that finding. *Id*. at 343. Here, we must affirm the summary judgment in favor of HIA and St. David's unless Walters produces

23

sufficient evidence to support her claim that the appellees' conduct was extreme and outrageous—a burden Walters did not meet.

Because Walters failed to satisfy her burden of producing a scintilla of evidence to raise a genuine issue of material fact about whether St. David's or HIA intentionally inflicted emotional distress upon her, Walters's third and sixth issues are overruled.

### *Tortious Interference with a Contract*

In her seventh issue, Walters claims that the HIA doctors tortiously interfered with her employment contract by requesting that Walters be restricted from HIA patients. To recover for tortious interference, a plaintiff must prove: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss. *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 1999).

Justification is an affirmative defense to tortious interference if the defendant's actions were based on either the exercise of its own legal rights or on a good-faith claim to a colorable legal right, even if that claim ultimately proves to be mistaken. *Id*. at 80. A defendant who has a legal right to interfere with the contract is privileged, regardless of his motivations for acting. *Id*. Otherwise, the defendant must prove that his actions were in good faith; but he need not prove that he asserted a "legally correct" right, only that the right has a colorable basis in the law. *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 426-27 (Tex. 2004). However, if the defendant's actions were tortious in themselves, then the defendant is not privileged nor justified, despite the existence of a legal right for his actions. *Prudential Ins. Co. of Am.*, 29 S.W.3d at 81.

HIA urges that its doctors were justified in requesting that Walters's assignments to HIA patients be limited because Walters violated the confidentiality policy and because the request was made in the patients' best interests.[8] The Texas Occupations Code and the Health and Safety Code broadly protect a patient's medical information as "confidential." *See* Tex. Occ. Code Ann. § 159.002; Tex. Health & Safety Code Ann. § 241.151. It is also well established in Texas that physicians owe a duty of care to their patients and are obligated to protect a patient's confidential information. *See Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex. 1997) ("physician's primary duty is to the patient"); *see also* Tex Occ. Code Ann. § 159.002 (physician cannot disclose patient's confidential information without proper authorization and physician may claim privilege of confidentiality on behalf of patient). Cole and Lux, therefore, were justified in approaching hospital personnel to request that Walters no longer be assigned to care for their patients, given their concerns that Walters revealed their patients' confidential medical information to a non-treating physician. The doctors' actions were not defamatory, nor otherwise "tortious in themselves," because their report that Walters violated the confidentiality policy was true. Because HIA conclusively established its affirmative defense of justification, Walters's seventh issue is overruled.

### *Qualified Privilege*

In response to all of Walters's claims, St. David's asserts the affirmative defense of qualified privilege, claiming that it is statutorily protected from any liability arising out of an action

---

[8] HIA also urges that, because Walters was an at-will employee, she lacked a contract subject to interference. However, "the terminable-at-will status of a contract is no defense to an action for tortious interference with its performance." *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989).

related to the nursing peer review process. The occupations code states that "a cause of action does not accrue for an act, statement, determination, or recommendation made, or act reported, without malice, in the course of peer review against . . . a hospital." Tex. Occ. Code Ann. §§ 160.010, 303.010(a)(2) (West 2004).

Walters claims in her first issue that St. David's is not entitled to this immunity because the hospital acted with malice and because the peer review was not completed. Actual malice has been defined as "ill will, spite, evil motives, and purposely injuring another." *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). An employer's actions that are based on a report of an employee's wrongdoing, which the employer reasonably believes to be true, cannot be labeled as "malicious." *Randall's Food Mkts.*, 891 S.W.2d at 647.

We have already discussed that it was not retaliatory for St. David's to terminate the peer review process, given that Walters's own actions—failing to return the counseling statement, missing several days of work at the end of her term, and resigning prior to the conclusion of the peer review—were the reason that her review was not completed. Because of this, and because there is no other proof of an evil motive or ill will on behalf of St. David's, it was not malicious for St. David's to terminate the peer review following Walters's resignation. Further, Walters claims that it was malicious for McGhee to include "false statements" in her counseling statement, but Walters testified that she considered McGhee's notes to be an "accurate summary" of what Walters told McGhee during their January 4 meeting. Walters also claims St. David's maliciously denied her "minimum due process" by "unilaterally dropping" the peer review and by not affording her an opportunity to submit a rebuttal statement. However, Walters testified that she understood the

26

process was terminated due to her resignation, and that she was provided the counseling statement, which stated that she could submit any written comments; she chose not to return it, despite McGhee's repeated reminders to do so.

There is also no authority to support Walters's claim that St. David's was obligated to complete the peer review process in order for the qualified privilege to apply. Walters acknowledges that nothing in the occupations code requires hospitals to proceed with or complete peer reviews of former employees. Tex. Occ. Code Ann. §§ 160.101, 303.010. Walters claims, however, that this obligation is inherent in the statute's purpose. We disagree. If the legislature had intended to hinge the qualified privilege on a requirement that hospitals complete peer reviews, even after the subject of the review resigned, it could have explicitly done so. The "purpose of the statute is to foster a free, frank exchange among medical professionals" about possible violations by their peers. *Irving Healthcare Sys. v. Brooks*, 927 S.W.2d 12, 16 (Tex. 1996). Once a hospital commences a peer review, it follows that the actions it has taken continue to be shielded by the qualified privilege when the peer process is not completed due to the employee's actions. Finally, contrary to Walters's lack of authority, St. David's points to the peer review policy itself, which expressly states that it applies to "current employees."

Because St. David's did not act with malice and because the qualified privilege applies regardless of whether the peer review was completed, we hold that, on these facts, St. David's "actions, statements, determinations, or recommendations" connected to Walters's peer review are entitled to immunity. Walters's first issue is overruled.

27

## CONCLUSION

Having found that St. David's and HIA conclusively demonstrated their entitlement to summary judgment as a matter of law, and that Walters failed to raise a fact issue on any material issue, we affirm the summary judgment in favor of the appellees.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   May 26, 2005